715 F.2d 1200
 James R. JACKSON, individually and as administrator of the
estates of Sandra A. Jackson, deceased, and Baby
Boy Jackson, deceased, Plaintiff-Appellee,
v.
CITY OF JOLIET, et al., Defendants-Appellants.
Velva ROSS, individually and as administrator of the estate
of Jerry D. Ross, Jr., deceased, Plaintiff-Appellee,
v.
CITY OF JOLIET, et al., Defendants-Appellants.
Velva ROSS, individually and as administrator of the estate
of Jerry D. Ross, Jr., deceased, Plaintiff-Appellee,
v.
COUNTY OF WILL, a municipal corporation, and Robert Tezak,
Will County Coroner, Defendants-Appellants.
 Nos. 82-2833 to 82-2835.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 26, 1983.
Decided Aug. 23, 1983.
 
 Nicholas E. Sakellariou, Corp. Counsel, Thomas A. Thanas, Asst. Counsel, Joliet, Ill., for defendants-appellants, City of Joliet.
 Gregory G. Lawton, Judge, Kurnick and Knight, Park Ridge, Ill., for defendants-appellants, County of Will.
 Sheldon H. Nahmod, Chicago, Ill., for plaintiffs-appellees.
 Before POSNER and COFFEY, Circuit Judges, and WYATT, Senior District Judge.*
 POSNER, Circuit Judge.
 
 
 1
 No problem so perplexes the federal courts today as determining the outer bounds of section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, the ubiquitous tort remedy for deprivations of rights secured by federal law (primarily the Fourteenth Amendment) by persons acting under color of state law. In the present cases, which are before us on interlocutory appeal under 28 U.S.C. § 1292(b) from denial of the defendants' motions to dismiss the complaints for failure to state a claim, see Fed.R.Civ.P. 12(b)(6), the specific question is whether the negligent failure of local public-safety workers to save the occupants of a burning automobile is actionable under section 1983 as a deprivation of life without due process of law.
 
 
 2
 The procedural posture of the cases requires us to take as true the facts alleged in the complaints. On November 21, 1980, at about 9:35 p.m., Jerry Ross, age 17, accompanied by Sandra Jackson, age 16, and six months pregnant, was driving on a road in Joliet, Illinois, when the car swerved off the road for unknown reasons, crashed, and burst into flames. Two minutes later a Joliet policeman, defendant Taylor, chanced on the scene. Although the car's wheels were spinning, its lights were on, its motor was running, and it was burning, Taylor made no attempt to determine whether it was occupied and did not call an ambulance. He did call the fire department (at 9:40) and he then returned to the road and directed traffic away from the scene of the accident. Five Joliet firemen, also defendants, arrived eight minutes later. At 10:19, having put out the fire, they first noticed Ross and Jackson slumped in the front seat of the car. They made no attempt to remove or assist either one but they did call an ambulance, which arrived at 10:26. The firemen and ambulance paramedics thought Ross dead and left him in the car, but they removed Sandra Jackson alive and took her to a hospital. She was admitted at 10:40 and pronounced dead, along with her fetus, at 10:55. Ross was later removed from his car by a tow-truck driver and pronounced dead by the county coroner (also a defendant) when the coroner arrived at 11:45.
 
 
 3
 The plaintiffs (representing Ross, Jackson, and the fetus) allege that their decedents would have been saved if Taylor had aided the occupants of the burning car, or called an ambulance, or at least not directed traffic in a way that prevented other potential rescuers from saving them, or if the firemen had discovered the car was occupied before the fire was put out or at least had aided the occupants then. The coroner is a defendant in Ross's suit because he had issued a directive that no nonsupervisory personnel (such as the firemen who discovered Ross) were to touch a corpse unless someone from his office was present, and Ross may have been alive when they discovered him. The city's police and fire chiefs, and the city and county themselves, are additional defendants, but we shall not have to consider their liability separately, or decide whether a section 1983 suit can be maintained on behalf of a deceased six-month-old fetus. The complaints also contain pendent claims under state tort law but the plaintiffs concede as they must that if their section 1983 claims are dismissed on the pleadings the pendent claims should also be dismissed. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).
 
 
 4
 Although the complaints are liberally sprinkled with words like "recklessly" and "knowingly," it is apparent and was admitted by the plaintiffs' counsel at oral argument that the plaintiffs do not believe that any of the defendants wanted to injure or kill the plaintiffs' decedents or could be charged with homicide, manslaughter, or some other crime or even with an intentional tort such as battery. It would be a different case if intentional misconduct were alleged; we may assume that if officer Taylor, knowing the car was occupied and wanting the occupants to be burned to death, directed traffic away from the scene in order to prevent any passing driver from saving them, he would be liable under section 1983 for having under color of the city ordinance making him a public officer deprived the plaintiffs' decedents of their lives without due process of law. See Brazier v. Cherry, 293 F.2d 401, 404-05 (5th Cir.1961); cf. State Bank v. Camic, 712 F.2d 1140, 1147 (7th Cir.1983). But all that the complaints in fact allege are that Taylor, negligently--at worst, grossly so--failed to save anyone who might be trapped in the burning car and prevented other motorists from doing so; that likewise the firemen, through negligence or gross negligence, failed to rescue the plaintiffs' decedents from the burning car or to assist them after the fire was put out; and that the coroner had issued a foolish rule which prevented the firemen and paramedics, who were not competent to determine without touching Ross whether he was dead, from aiding him while he may still have been alive.
 
 
 5
 Now there is of course no general common law duty to rescue a stranger in distress even if the rescue can be accomplished at no cost to the rescuer. See, e.g., Yania v. Bigan, 397 Pa. 316, 155 A.2d 343 (1959). And although circumstances can create such a duty, see, e.g., DePue v. Flateau, 100 Minn. 299, 111 N.W. 1 (1907); Hutchinson v. Dickie, 162 F.2d 103 (6th Cir.1947), a mere failure to rescue is not tortious just because the defendant is a public officer whose official duties include aiding people in distress. Warren v. District of Columbia, 444 A.2d 1, 3-9 (D.C.App.1981); Williams v. California, 34 Cal.3d 18, 192 Cal.Rptr. 233, 664 P.2d 137 (1983). But if you do begin to rescue someone you must complete the rescue in a nonnegligent fashion even though you had no duty of rescue in the first place. See, e.g., Cross v. Wells Fargo Alarm Services, 82 Ill.2d 313, 317, 45 Ill.Dec. 121, 123, 412 N.E.2d 472, 474 (1980); Farwell v. Keaton, 396 Mich. 281, 240 N.W.2d 217 (1976); Restatement (Second) of Torts § 323 (1965). The rationale is that other potential rescuers (if any) will be less likely to assist if they see that someone is already at the scene giving aid. See, e.g., United States v. Lawter, 219 F.2d 559, 562 (5th Cir.1955). This rationale is strained in some cases, cf. Restatement, supra, § 323, comment e; Prosser, Handbook of the Law of Torts 347-48 (4th ed. 1971), but not here: with a policeman and firemen at the scene of the accident, no motorist was likely to assist the occupants of Ross's burning car--especially when the police officer was directing them away from the scene.
 
 
 6
 But even if the complaints state good claims under general tort principles, it does not follow that they state good claims under section 1983 just because the defendants are public officers. See, e.g., Street v. Surdyka, 492 F.2d 368, 369, 371 (4th Cir.1974); Williams v. Thomas, 692 F.2d 1032, 1035 (5th Cir.1982). Section 1983 provides a remedy only for violations of federal law. Although the complaints allege violations of both the equal protection and due process clauses of the Fourteenth Amendment, they clearly state no claim under the former. If the defendants had withheld protection from the plaintiffs' decedents because they were blacks or members of some other vulnerable minority--if the defendants were discriminating in a vicious or irrational fashion--there would be an equal protection issue. See Smith v. Ross, 482 F.2d 33, 36-37 (6th Cir.1973) (per curiam). But only deliberate discrimination violates equal protection, Shango v. Jurich, 681 F.2d 1091, 1104 (7th Cir.1982), and is not alleged in this case. The defendants did not know that anyone, alive or dead, was in the car until they put out the fire. They certainly did not know whether there was anyone belonging to a group to which they were hostile.
 
 
 7
 If the plaintiffs have a claim it is under the Fourteenth Amendment's due process clause, which forbids the state to deprive anyone of life, liberty, or property without due process of law. There are two ways in which the complaints might be thought to allege a violation of the due process clause. First, it could be argued that the liberties secured by the clause include not only the traditional negative liberties--the right to be let alone, in its various forms--but also certain positive liberties, including the right to receive the elementary protective services that the state routinely provides users of its highways. If so, and a state officer deprives a person of such a liberty and death ensues as a proximate result, damages for that death could be recovered under section 1983.
 
 
 8
 The problem with this argument is that the Constitution is a charter of negative rather than positive liberties. Harris v. McRae, 448 U.S. 297, 318, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980); Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982). The men who wrote the Bill of Rights were not concerned that government might do too little for the people but that it might do too much to them. The Fourteenth Amendment, adopted in 1868 at the height of laissez-faire thinking, sought to protect Americans from oppression by state government, not to secure them basic governmental services. Of course, even in the laissez-faire era only anarchists thought the state should not provide the type of protective services at issue in this case. But no one thought federal constitutional guarantees or federal tort remedies necessary to prod the states to provide the services that everyone wanted provided. The concern was that some states might provide those services to all but blacks, and the equal protection clause prevents that kind of discrimination.
 
 
 9
 The modern expansion of government has led to proposals for reinterpreting the Fourteenth Amendment to guarantee the provision of basic services such as education, poor relief, and, presumably, police protection, even if they are not being withheld discriminatorily. See, e.g., Michelman, Foreword: On Protecting the Poor Through the Fourteenth Amendment, 83 Harv.L.Rev. 7 (1979). To adopt these proposals, however, would be more than an extension of traditional conceptions of the due process clause. It would turn the clause on its head. It would change it from a protection against coercion by state government to a command that the state use its taxing power to coerce some of its citizens to provide services to others. The Supreme Court has refused to go so far, see, e.g., San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), except where indigence prevents an individual (a criminal defendant in particular) from protecting himself against coercion by the state. See, e.g., Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Whether the Court has refused because a guarantee of basic service cannot easily be squared with the text or intellectual ambience of the Fourteenth Amendment or because judges lack objective criteria for specifying minimum levels of public services or are reluctant to interfere with the public finance of the states need not trouble us. It is enough to note that, as currently understood, the concept of liberty in the Fourteenth Amendment does not include a right to basic services, whether competently provided or otherwise.
 
 
 10
 But the plaintiffs have another argument: The Fourteenth Amendment forbids a state to deprive anyone of his life without due process of law; to deprive a person of his life through negligence is the antithesis of due process; therefore the complaints state a cause of action under section 1983. This argument would succeed if the defendants had killed the plaintiffs' decedents in circumstances making the killing an intentional tort. But the reason it would succeed is not the syllogism that the plaintiffs press on us; it is history. The due process clause was intended to protect the recently liberated blacks from official oppression, and because it was decided not to write the clause in racial terms, to protect everyone else besides. If due process is not provided, it makes no difference whether the state hangs you or has you shot down in the street by a police officer. Section 1983 has been read to take the command of the due process clause one step further by imposing liability on officers acting under color of, though contrary to, state law. But the concern is with the use of state-created power to kill rather than with the state's failing to prevent death. Ross's car ran off the road and burst into flames for reasons unrelated to the actions of any state officer. The plaintiffs' claim is not that the defendants tried to harm the occupants of the car but that they failed to help them. But the difference between harming and failing to help is just the difference noted earlier between negative liberty--being let alone by the state--and positive liberty--being helped by the state. To accept the plaintiffs' syllogism would be to impose by another route a duty to provide basic services. Here the state acted promptly but, it is alleged, ineffectually. The next case if this one succeeds will be one where the police and fire departments, maybe because of budget cuts, do not arrive at the scene of the accident at all.
 
 
 11
 True, that would be a case of pure, or at least purer, inaction, a case where the defendants had not made the plaintiffs' decedents worse off but simply had failed to make them better off. In the present case, because rescue efforts were begun, the defendants may have made the plaintiffs worse off; if they had done nothing, maybe some passing motorist would have stopped and pulled the plaintiffs' decedents out of the burning car before it was too late. Maybe therefore this case is like White v. Rochford, 592 F.2d 381 (7th Cir.1979), where the police arrested a driver and left his child passengers stranded in a driverless car, thus putting the children in a situation of peril for the consequences of which the police were held liable under section 1983; or like the cases that hold jailers liable for injuries resulting from deliberate indifference to the medical needs of their prisoners, as in Wood v. Worachek, 618 F.2d 1225, 1233 (7th Cir.1980), or from assaults by other inmates, as in Spence v. Staras, 507 F.2d 554, 557 (7th Cir.1974). But such cases are distinguishable from this one. In White v. Rochford the arrest created the danger to the children; here the plaintiffs' decedents were in great danger before the defendants appeared. In the prisoner cases too, it was the state that put the plaintiff in a place of potential danger. This case is closer to Bowers v. DeVito, supra, where the state officers did not create but merely failed to avert danger, by negligently releasing from custody a dangerous lunatic who then killed the plaintiff's decedent; and to Hull v. City of Duncanville, 678 F.2d 582 (5th Cir.1982), where the city's negligent failure to enforce the speed limit at a railroad crossing resulted in the plaintiff's being seriously injured in a crossing accident. See also Reiff v. City of Philadelphia, 471 F.Supp. 1262, 1266 (E.D.Pa.1979). In none of these cases was the defendants' conduct actionable under section 1983.
 
 
 12
 Although in theory, as suggested earlier, a botched rescue could make the objects of the rescue attempt worse off than if the attempt had not been made, that was also true in Bowers, Hull, and Reiff. In Hull, for example, the plaintiff might have taken more care at the crossing if he had known that the city was not enforcing the speed limit. The probability that the conduct of the defendants in this case actually made the plaintiffs' decedents worse off is hardly less speculative. It is extremely unlikely that a passing motorist would enter a burning car on the off chance that the occupants were still in it and if so were still alive, and it is even less likely that a passing motorist would have extinguished the fire. We cannot resolve these factual issues here; but the unlikelihood that the plaintiffs' decedents would have been saved by private persons if the state had not attempted to rescue them shows how artificial it is to argue that the defendants deprived the plaintiffs' decedents of their lives. If the defendants deprived the plaintiffs' decedents of anything it was of some right to competent rescue services. But, as we have been at pains to stress, there is no such right in the Fourteenth Amendment. Of all the forms of state oppression of the individual, that which consists of trying but failing to assist at accidents must rank very low. It is not "oppression" at all; it is essentially inaction; and it was remote from the concerns of the framers of the Fourteenth Amendment. Although there are many hazards of which the framers of the Fourteenth Amendment and the Civil Rights Act of 1871 could not have been aware, fire--a greater hazard in the nineteenth century than it is today--and accidents, and careless policemen, careless firemen, and careless medical workers, are not among them. What happened in this case is not the kind of thing that the framers were not concerned about because they could not foresee but the kind of thing they knew about and surely did not think required a federal tort remedy to prevent.
 
 
 13
 There is no reason for federal judicial intervention in a case like this. In some situations the incentives of state and local officials to provide effective and evenhanded aid and protection to their citizens may be distorted by politics or prejudice; but rescuing people from burning cars is not one of them. If local government does a bad job of providing police and fire protection, political retribution will come swift and sure; if elected state judges (Illinois judges are elected) do not provide evenhanded and effective tort remedies for local victims of auto accidents, their days in office may be numbered too. We need not fear that unless the federal courts intervene the type of incompetence alleged in these complaints will flourish unchecked by state law.
 
 
 14
 The Civil Rights Act of 1871 did not make every tort committed under color of state law actionable in federal court. Paul v. Davis, 424 U.S. 693, 699-701, 96 S.Ct. 1155, 1159-1161, 47 L.Ed.2d 405 (1976); Baker v. McCollan, 443 U.S. 137, 146-47, 99 S.Ct. 2689, 2695-96, 61 L.Ed.2d 433 (1979); Martinez v. California, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980); Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). These cases and others we might cite are distinguishable but they express a mood to which we are obligated to pay respectful attention--a mood of concern lest state tort law be completely swallowed up by section 1983. The danger is acute here. In any traffic accident case--in any accident case--one can argue that the police, the firemen, and other public-safety workers should have done more to assist the accident victim. If the district court's decision were affirmed, many traffic accidents, especially single-car accidents, would become the subject of federal litigation. Section 1983 is not a mandate of highway safety.
 
 
 15
 We hold that an attempt by state officers to assist at an accident is not a deprivation of life without due process of law under the Fourteenth Amendment when the attempt fails because of the negligence or even gross negligence of the officers or their superiors, and the accident victim dies. The orders of the district court denying the defendants' motions to dismiss the complaint are therefore reversed and the cases are remanded with directions to dismiss the complaints for failure to state a claim under federal law.
 
 
 
 *
 Hon. Inzer B. Wyatt of the Southern District of New York, sitting by designation