Gregory TAYLOR, Individually, as Conservator of the Estate of Karen Taylor, and as Next Friend of Jennifer Lynn Taylor, a Minor, Plaintiffs,

v.

David WATTERS, Sergeant Joseph Swiercz, Captain S.J. Sullivan, and the City of Ferndale, a municipal corporation, and the Estate of Alvin Freeman, Deceased, Defendants.

Civ. A. No. 85–0605.

United States District Court, E.D. Michigan, S.D.

May 2, 1986.

Steven C. Berry, Troy, Mich., for plaintiffs.

John Hayes, John Dise, Detroit, Mich., for defendants.

## MEMORANDUM OPINION

SUHRHEINRICH, District Judge.

Plaintiffs brought this action under 42 U.S.C. § 1983 to recover damages against several Ferndale police officers and the City of Ferndale for the shooting of Karen Taylor at the Rialto Restaurant on July 3, 1984. This matter is currently before the Court upon defendants' motion to dismiss or for summary judgment.

### I.

The Court has pieced together the following summation from the three depositions attached to defendants' motion.

At approximately 5:00 p.m. on July 3, 1984, Alvin Freeman walked into the Rialto Restaurant on Woodward Avenue in Ferndale, Michigan and sat at a table. After placing his order, Freeman walked over to Detective Dan Bolen of the Ferndale Police Department and shouted at him. Freeman drew his gun and fired at least two shots which wounded Bolen and another patron, John Bylski. Freeman then grabbed the waitress, Karen Taylor, and ordered everyone to go out of the restaurant. Bolen was helped to the building next door. Bylski, however, collapsed on the sidewalk south of the restaurant. In addition to his own gun, Freeman had taken Bolen's service revolver.

Officers David Watters and Tom Cupples were the first officers to arrive at the Rialto. They immediately rendered aid to Bylski. Bystanders informed the officers that there was a man inside the Rialto with a gun and he had taken two female hostages. It is unclear from the testimony when the police realized that Freeman only had one hostage. Watters then proceeded to the rear of the restaurant.

Captain Stanley Sullivan and Sergeant Joseph Swiercz arrived at approximately 5:06. Within minutes, they established perimeters around the Rialto to keep pedestrians and motor vehicles out of the line of fire, positioned officers directly outside the restaurant and atop nearby buildings to control Freeman's movements, and began gathering information from the patrons and employees. This included having one of the employees provide a diagram of the inside of the restaurant. The employee indicated that there was a back passageway from the kitchen to the men's restroom which could not be seen from the dining area. Sullivan also talked to Bolen who identified Freeman as the gunman. Freeman was well known to the Ferndale Police Department, in part, because he owned a nearby party store. Freeman would regularly call the police to come over to the store and stand guard while he locked up at night. It also appears that Freeman had a violent relationship with his wife which required the police to frequently intervene in their disputes. In fact, Freeman was convicted the day before this incident of an assault charge involving his wife. The officers testified, however, that Freeman never demonstrated any animosity toward them and was even cordial to them when he was arrested on the assault complaint.

Sullivan, Swiercz and Lieutenant Marshall tried to negotiate with Freeman over the phone and the bull-horn during the entire seige. All three had some training and experience as negotiators. Freeman called the police station at approximately 5:18 and 5:23 and demanded that his wife be brought to the scene. He refused, however, to stay on the line. Sullivan then ordered the desk sergeant to continually call the restaurant. Sullivan also stationed an officer at the phone in a nearby store to call on a second line in an effort to force Freeman to negotiate. Freeman refused to answer the phones and ignored the officers' attempts to establish a dialog. He refused to articulate his demands and merely shouted for the officers to come in and get him.

At approximately 5:45 and 5:49, Freeman fired several shots at the officers. The first set of shots knocked out the front glass windows. Freeman again called the station and demanded to talk to the Chief. He again refused to stay on the phone.

In the meantime, Sullivan had directed Swiercz to enter the restaurant through the back door and pinpoint the locations of Freeman and the hostage. Swiercz entered the building at approximately 6:00. He was able to position himself near the swinging doors that separate the kitchen and dining areas. Officers Watters and Cupples also positioned themselves in the kitchen. After Swiercz was able to determine the approximate location of Freeman and the hostage, he left the building. Officers Watters and Cupples remained in the kitchen and were joined by Officer Raymond. Officers Page and Denmark were able to position themselves in the men's bathroom. At 6:29, Officer Denmark reported that a shot had been fired near the bathroom and he heard the hostage scream that she had been shot in the leg. The officers testified that Freeman and the hostage were yelling and screaming a great deal.

At this point, Sullivan called a conference with Swiercz and Marshall to develop a plan to make entry into the restaurant to secure the release of the hostage. Capt. Sullivan testified that he decided to enter the building because 1) Freeman refused to negotiate 2) they couldn't make visual contact with Freeman through the long-range sniper weapons, 3) Freeman indicated by shooting the hostage that he had no intention of using her in his escape or negotiations, and 4) the need to provide the hostage with medical care.

Swiercz and Marshall led two teams into the restaurant at approximately 6:45. Officers Watters and Cupples joined Swiercz and positioned themselves in the men's bathroom at the southeast-east corner of the restaurant. Marshall and his group were stationed in the kitchen by the swinging doors near the north end of the building. The officers all testified that shortly before 7:00 they heard another shot and didn't hear anything from the hostage thereafter. According to the deposition testimony, Sullivan gave the order to fire shots above the doorway to create a diversion at 7:03:36. Within the next few seconds, Marshall threw a pot out of the kitchen to draw Freeman away from the south-end of the restaurant. Freeman turned and fired at the officers who were coming out of the kitchen. Simultaneously, Swiercz and Watters came through the hallway near the bathroom and fired at Freeman who was standing over the hostage. The order to cease fire was given at 7:03:47. Freeman was hit in the head and arm and pronounced dead at the scene. The hostage was found sitting on the floor in front of the booth facing north with bullet wounds to the head and leg. Ms. Taylor is currently in a coma and the right side of her body is paralyzed.

Although the parties did not attach a copy of the ballistics test results to their pleadings, Capt. Sullivan testified that the results indicated the bullet which struck Taylor in the head was fired from Freeman's gun. Plaintiffs, however, strongly disagree with Capt. Sullivan's interpretation of the report, and will rely on experts to show that the bullet might well have come from an officer's gun.

Plaintiffs allege in their complaint that the Ferndale police officers and their superiors forced "an unnecessary and avoidable confrontation" by failing to negotiate with Freeman or summon expert assistance from a trained hostage negotiator and intentionally discharged their weapons without verifying the position of Taylor. These actions were committed with "gross and culpable recklessness and in shocking and unjustified disregard for [Taylor's] safety and constitutional rights". Plaintiffs contend that Taylor was deprived of her liberty without due process of law in violation of the Fourteenth Amendment. The City of Ferndale also deprived Taylor of her constitutional right by not providing its officers with adequate training and supervision in hostage situations.

Defendants move for summary judgment on the following grounds: 1) plaintiffs have not claimed a constitutionally cognizable liberty interest; 2) defendants did not act intentionally or recklessly to deprive Taylor of any rights; 3) plaintiffs have failed to demonstrate that the state remedies are inadequate; and 4) plaintiffs have not stated a substantive due process claim.

Section 1983 of the Civil Rights Act provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory." 42 U.S.C. § 1983. The statute's primary purpose is the "preservation of human liberty and human rights...." *Owen v. City of Independence*, 445 U.S. 622, .636, 100 S.Ct. 1398, 1408, 63 L.Ed.2d 673 (1980).

In order to recover under section 1983, plaintiffs must demonstrate that 1) some person or persons deprived Taylor of a federal right, and 2) the person or persons who deprived her of that right was acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980); *Dunn v. State of Tennessee*, 697 F.2d 121, 125 (6th Cir.1982). There is no dispute here that the officers involved acted under color of state law. Therefore, the sole question before the court is whether Taylor has been deprived of a federal right. Plaintiffs allege that Taylor was deprived of a liberty interest without due process of law when defendants entered the Rialto with the desire to execute Freeman at the expense of Taylor's life and safety. Plaintiffs advance both procedural and substantive due process claims.

## II.

Defendants contend that Taylor does not have a constitutionally recognized liberty interest in being protected from criminal intrusion or in being rescued. To support their position, defendants rely upon two Seventh Circuit cases authored by Judge Richard Posner, *Bowers v. DeVito*, 686 F.2d 616 (7th Cir.1982), and *Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir.1983).

In *Bowers*, the state released Vanda, a felon, from the mental health facility and a year later, he murdered Ms. Bowers. Plaintiffs alleged that the state defendants knew that Vanda was dangerous when they released him, and acted recklessly in doing so. The court held that Ms. Bowers did not have a constitutional right to be protected by the state against being murdered by criminals or madmen absent some special relationship. The court determined that defendants did not place Ms. Bowers in a place or position of danger; they simply failed to adequately protect her, as a member of the public, from a dangerous man. "The Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." 686 F.2d at 618.

In *Jackson*, plaintiffs' decedents were driving on a road in Joliet, Illinois when the car swerved off the road, crashed, and burst into flames. A Joliet policeman happened to drive by the accident a few minutes later. The officer did not check to see if anyone was in the car, but did call the

fire department. He also directed traffic away from the accident. When the firemen put out the fire, they noticed plaintiffs' decedents in the front seat of the car. The firemen and paramedics thought the driver was dead and left him in the car, but they removed the passenger alive and took her to the hospital. Unfortunately, she died 15 minutes after her arrival. Plaintiffs alleged that their decedents would have been saved if the officer had aided the occupants of the burning car, or called an ambulance, or not directed traffic away from the scene. The court held, however, that "an attempt by state officers to assist at an accident is not a deprivation of life without due process of law under the 14th Amendment when the attempt fails because of negligence or even gross negligence of the officers or their superiors, and the accident victim dies". 715 F.2d at 1206.

If the defendants deprived the plaintiffs' decedents of anything it was of some right to competent rescue services. But, as we have been at pains to stress, there is no such right in the Fourteenth Amendment. Of all forms of state oppression of the individual, that which consists of trying but failing to assist at accidents must rank very low. It is not "oppression" at all; it is essentially inaction; and it was remote from the concerns of the framers of the Fourteenth Amendment.

*Id.* at 1205.

The present case, however, does not fit nicely within the contours of either *Bowers* or *Jackson.* Instead of alleging that defendants failed to act, plaintiffs have taken the position that because of defendants' actions it was virtually guaranteed that Taylor would be injured or killed. In *Bowers,* by contrast, the state officials merely released a man they did not know would kill; and in *Jackson,* the state officials failed to realize that the burning car, away from which they directed other traffic, was occupied. In neither case did the defendants intend or act recklessly to allow deaths to occur. If the killer in *Bowers* had disclosed to the doctor-defendants a calculated design to kill the victim and yet was released and the victim was not warned, or if the police-defendants in *Jackson* had peered in the windows watching the victims burning inside the car, those cases might have been different, for the defendants might then have been deemed more responsible for the loss of life. For in those instances, the degree of active state involvement in the deprivation was greater. Indeed, the court in *Bowers* recognized the limitations of its generalization.

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard so say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Bowers,* 686 F.2d at 618.

██ It is the Court's opinion that once the officers knew Taylor had been shot in the leg, they were obligated to act. If they had not and Taylor had bled to death, or her condition deteriorated because of their inaction, under *Jackson,* the officers conceivably could be held liable under section 1983. At oral arguments, however, plaintiffs admitted that the alleged constitutional tort was completed when Taylor was shot in the leg. The Court must, therefore, focus on the officers' actions from the moment they arrived at the Rialto until she was wounded to determine if Taylor was deprived of a protected liberty interest at the hands of the state.

██ The Court acknowledges that Taylor does not have a constitutional right to be protected from criminals or madmen absent a special relationship; however, Taylor does have a constitutional right to be free from unjustified state intrusions on personal security. *See Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977). While Freeman may have initially placed Taylor in a position of peril, she still had the right

to ultimate bodily security from excessive conduct at the hands of the officers. Therefore, if the officers handled the hostage situation in a manner which was grossly disproportionate to the need for action, or "so brutal, demeaning, and harmful as to literally shock the conscience of the court," Taylor was deprived of a constitutionally recognized liberty interest. *See generally Hall v. Tawney,* 621 F.2d 607 (4th Cir.1980).

After a review of the record, the Court believes that this case involves, at best, an error in judgment and not a deprivation of a recognized liberty interest. At oral arguments, plaintiffs augmented the record by submitting an affidavit from their expert. Based upon the expert's opinion, plaintiffs argue that the officers violated fundamental policies and procedures regarding hostage situations as to demonstrate a reckless and callous indifference to the life and safety of Taylor. Assuming *arguendo* that plaintiffs' allegations are founded, the alleged reckless and deliberate indifference of defendants' actions may have made Taylor a victim of an unjustified state intrusion. The Court, however, will not rule upon this portion of defendants' motion for summary judgment until the background and experience of plaintiffs' proffered expert has been verified. The Court is still not convinced that this case rises to the level of a constitutional tort. The parties shall submit their information regarding Mr. Katsaris on or before May 27, 1986.

### III.

The procedural due process analysis does not stop because plaintiffs have arguably shown that Taylor may have been deprived of a protected liberty interest. Plaintiffs must also demonstrate that this interest has been infringed upon without due process of law. *Bacon v. Patera,* 772 F.2d 259, 263–64 (6th Cir.1985). This can be accomplished in one of two ways. First, plaintiffs can show that the City of Ferndale had an established procedure or policy that the main objective in a hostage/gunman situation is to execute the gunman and disregard the danger to the hostage. In the present case, plaintiffs have not made such allegations or submitted any evidence to suggest this sort of pattern or practice.

Second, plaintiffs can establish a procedural due process claim by showing that defendants' actions were only "random and unauthorized" conduct. In conjunction with this allegation, plaintiffs must also show that state remedies are inadequate. *Bacon,* 772 F.2d at 264; *Wilson v. Beebe,* 770 F.2d 578, 583–84 (6th Cir.1985).

In *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the Supreme Court limited the use of section 1983 in procedural due process cases. The Court held that there is no cause of action under the statute for random, unauthorized acts of state officials which deprive a person of property if the state provides an adequate post-deprivation remedy. *Id.* at 537, 101 S.Ct. at 1914. The Sixth Circuit has recently stated:

> If the state does provide a remedy which meets this standard, then the deprivation, though under color of state law, is not without due process of law. The state remedy need not be as complete as that which would have been provided by section 1983. 'Although the state remedies may not provide the respondent with all the relief which may have been available if it could have proceeded under section 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process.

*Wilson,* 770 F.2d at 583 (quoting *Parratt v. Taylor,* 451 U.S. at 544, 101 S.Ct. at 1917).

Defendants argue in their motion for summary judgment that plaintiffs' procedural due process claim must fail because 1) defendants did not act intentionally to deprive Taylor of her liberty interest, and 2) plaintiffs have not demonstrated that the state remedies are inadequate.

In the recent Supreme Court cases of *Daniels v. Williams,* —— U.S. ——, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and *Davidson v. Cannon,* —— U.S. ——, 106 S.Ct.

668, 88 L.Ed.2d 677 (1986), the Court held that the mere lack of due care or negligence by a state official does not deprive an individual of life, liberty, or property under the fourteenth amendment. *Daniels*, —— U.S. at ——, 106 S.Ct. at 663–64, 88 L.Ed.2d at 666. The Court, however, did not consider "whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." *Id.* —— U.S. —— n. 3, 106 S.Ct. at 667 n. 3, 88 L.Ed.2d at 670 n. 3.

■ In this case, the Court need not determine whether defendants acted intentionally, recklessly or with deliberate indifference. The Court must ask only whether the State of Michigan provides an adequate post-deprivation remedy. In this case, it appears that plaintiffs have adequate remedies under state law in the form of a tort action for negligence, assault and battery, and intentional infliction of emotional distress. These claims were originally filed as pendent state claims, but the Court dismissed them without prejudice pursuant to *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Plaintiffs argue that the state remedies are inadequate because the Michigan Supreme Court recently expanded the applicability of governmental immunity. *See Ross v. Consumers Power*, 420 Mich. 567, 363 N.W.2d 641 (1985). The mere existence of a possible defense does not render a state procedure constitutionally defective. *Daniels*, —— U.S. at ——, 106 S.Ct. at 680, 88 L.Ed.2d at 675 (Stevens, J., concurring). Plaintiffs will have the opportunity to present evidence and a jury can decide whether the officers were 1) acting during the course of their employment, 2) acting in good faith, or 3) performing discretionary as opposed to ministerial acts. Since the state remedies appear adequate, plaintiffs have not stated a procedural due process claim. *Beebe*, 770 F.2d at 583–84. The Court will, therefore, grant defendants' motion as to this claim.

## IV.

■ Substantive due process claims fall within two categories: 1) official conduct that shocks the conscience as in *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952), or 2) the conduct infringes a specific constitutional guarantee. In this case, plaintiffs allege that defendants acted unreasonably in violation of the United States Constitution. It does not appear, however, that plaintiffs' claim falls within the ambit of a specific constitutional guarantee other than the fourteenth amendment. As such, the Court must determine whether the defendants' actions "shock the conscience." *Beebe*, 770 F.2d at 584 (citing *Hudson v. Palmer*, 104 S.Ct. at 3208 n. 4). The Sixth Circuit has described this as a "substantive due process right akin to the 'fundamental fairness' concept of procedural due process." *Beebe*, 770 F.2d at 584.

The "shocks the conscience" standard has its genesis in the *Rochin* case. There a suspect placed some capsules containing narcotics in his mouth as he was being arrested. Police took him to the hospital where his stomach was pumped to recover the capsules as evidence. The Court found that such police conduct offended the "canons of decency and fairness which express ... notions of justice...." 342 U.S. at 169, 72 S.Ct. at 208. *See also Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) (intentional assault upon prisoner with death threat).

■ In determining whether defendants' conduct raises to this level, the Court must consider the following factors: 1) the need for the force, 2) the relationship between the need and the amount used, 3) the extent of the injury, and 4) the motivations of the officers in applying the force. *Lewis v. Downs*, 774 F.2d 711, 713 (6th Cir.1985). "Finally, the circumstances surrounding the use of force must be carefully considered." *Id.*

■ The Court is not comfortable making a determination whether defendants' actions "shock the conscience" based upon the current record. While the Court is of

the opinion that the officers acted within the bounds of reason, it is constrained to deny the motion for summary judgment on the substantive due process claim until the parties have verified the background and experience of plaintiffs' expert. However, since liability is tenuous at best, the Court will exercise its discretion under Fed.R. Civ.P. 42(b) and order separate trials on the issues of liability and damages. An appropriate order will be entered.