**Joshua DeSHANEY, a minor, by his guardian ad litem, Curry FIRST, Esq.; and Melody DeShaney, Plaintiffs-Appellants,**

v.

**WINNEBAGO COUNTY DEPARTMENT OF SOCIAL SERVICES, et al., Defendants-Appellees.**

No. 86–2188.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1987.

Decided Feb. 12, 1987.

Rehearing and Rehearing En Banc Denied April 21, 1987.

---

Donald J. Sullivan, Cheyenne, Wyo., Curry First, Perry, First, Lerner & Quindel, Milwaukee, Wis., for plaintiffs-appellants.

Mark J. Mingo, Simarski & Stack, Ltd., Milwaukee, Wis., for defendants-appellees.

Before POSNER and COFFEY, Circuit Judges, and GRANT, Senior District Judge.[*]

POSNER, Circuit Judge.

This appeal requires us to decide whether a reckless failure by Wisconsin welfare authorities to protect a child from a parent's physical abuse deprives the child of liberty or property within the meaning of the Fourteenth Amendment.

Since the case was dismissed on summary judgment, we state the facts as favorably to the plaintiffs as the record will allow. The principal plaintiff, Joshua DeShaney, was born in 1979, the son of Melody and Randy DeShaney (Melody is also a plaintiff). Joshua was born in Wyoming, where the DeShaneys then lived and where his mother still lives. In 1980 a court in Wyoming granted the DeShaneys a divorce. The court awarded custody of Joshua to his father. Shortly afterward, Randy moved to Wisconsin, bringing Joshua with him. There he married (and shortly afterward divorced) a woman whose lawyer told the police in 1982 that Randy had "hit the boy, causing marks and is a prime case for child abuse."

In January 1983, Randy DeShaney's girlfriend, Marie, brought Joshua to a hospital. He was covered with bruises and abrasions—from an attack by another child, she said, but the emergency room personnel suspected child abuse. They notified the

[*] Hon. Robert A. Grant of the Northern District of Indiana, sitting by designation.

Winnebago County Department of Social Services immediately, and by the end of the day that Joshua had been admitted to the hospital the Department had obtained an order from a Wisconsin juvenile court placing him temporarily in the hospital's custody. See Wis.Stat. §§ 48.13(3), 48.19, 48.-207. Three days later an ad hoc "child protective team," consisting of a pediatrician, a psychologist, a police detective, a lawyer for the county, a caseworker for the Department named Ann Kemmeter, her superior, and others, discussed the situation. On the basis of this discussion the county's lawyer decided that there was insufficient evidence of child abuse to retain Joshua in the custody of the court (authorized by Wisconsin law if "probable cause exists to believe that if the child is not held he or she will ... be subject to injury by others," Wis.Stat. § 48.205(1)(a); see also §§ 48.19, 48.21). So Joshua was returned to Randy DeShaney's custody. The team recommended, however, that Randy be required to enroll Joshua in the Headstart program, receive counseling from the Department, and tell Marie to move out of Randy's house—for Randy had suggested that she might be abusing Joshua. This recommendation was embodied in a written agreement between Randy and the Department, a form of informal disposition of juvenile cases that Wisconsin law authorizes. See Wis.Stat. § 48.245.

Three weeks later the court closed the child-protection case that the Department had brought. A month after this Ann Kemmeter received word from the hospital that Joshua had again been treated for suspicious injuries. But after talking to the hospital's social worker she concluded that there was no evidence of child abuse.

Ann Kemmeter visited the DeShaney household in May. She noticed a bump on Joshua's forehead. Randy and Marie said he had gotten it falling off a tricycle. Kemmeter visited the household again in July, and noticed that Marie still hadn't moved out and that Joshua still hadn't been enrolled in Headstart. In September she visited again and asked to see Joshua but was told by someone that Randy and Marie had taken Joshua to the emergency room with a scratched cornea. In October she visited again and noticed another bump on Joshua's head. On her next visit, which was in November, she noticed that Joshua had a scrape on his chin; it looked to her like a cigarette burn. Later that month Joshua was treated at the emergency room for a cut forehead, bloody nose, swollen ear, and bruises on both shoulders. Emergency room personnel notified the Department of Social Services that they believed that he was a victim of child abuse, but there was no reaction from the Department.

Kemmeter next visited the DeShaney household in January (1984), but was told she couldn't see Joshua because he was in bed with the flu. She returned on March 7 and was told that several days earlier Joshua had fainted in the bathroom for no apparent reason. She did not ask to see him on this occasion—and has not been able to give a reason why not. The next day Randy DeShaney beat Joshua so severely that he critically injured Joshua's brain. The neurosurgeon who treated Joshua found evidence of previous traumatic injury to the head, and Joshua's body was covered with bruises and lesions of different vintages. Joshua's mother was summoned from Wyoming. When she arrived Kemmeter told her, "I just knew the phone would ring some day and Joshua would be dead." He was not dead, but half his brain had been destroyed. He is confined to an institution for the profoundly retarded, and will remain institutionalized for the rest of his life. Randy DeShaney was convicted of child abuse and given a sentence of two to four years in prison.

This suit, brought by Joshua and his mother, charges Winnebago County, its Department of Social Services, Ann Kemmeter, and her supervisor with having deprived Joshua of his liberty without due process of law, in violation of section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983. Section 1 imposes liability on anyone who, acting under color of state law, "subjects, or causes to be subjected," a person to "the deprivation of" his federal rights. The complaint contains a "pendent

party" claim against Randy DeShaney, see *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1359–61 (7th Cir.1985) (separate opinions), but the district court relinquished jurisdiction of this claim when it dismissed the federal claim on the defendants' motion for summary judgment, see *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The court held that the failure of a state agency to render protective services to persons within its jurisdiction does not violate the due process clause.

There are two possible theories on which the defendants (excluding Randy DeShaney, who is not a defendant in the section 1983 count and who was not acting under color of state law when he abused his son) might be thought to have violated Joshua DeShaney's Fourteenth Amendment rights. First, the defendants might be thought to have deprived him of a right—a form of liberty or property—to be protected by the Department of Social Services from the brutalities perpetrated by his father. Second, they might be thought to have deprived him of his right to bodily integrity (again viewed as a form of liberty or property within the meaning of the due process clause) by failing to protect him from his father.

■ The first theory is foreclosed by the rule, well established in this circuit, that the state's failure to protect people from private violence, or other mishaps not attributable to the conduct of its employees, is not a deprivation of constitutionally protected property or liberty. See, e.g., *Walker v. Rowe,* 791 F.2d 507, 510 (7th Cir.1986); *Ellsworth v. City of Racine,* 774 F.2d 182, 185 (7th Cir.1985); *Jackson v. Byrne,* 738 F.2d 1443, 1446 (7th Cir.1984); *Beard v. O'Neal,* 728 F.2d 894, 898–900 (7th Cir. 1984); *Jackson v. City of Joliet,* 715 F.2d 1200, 1203–04 (7th Cir.1983); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982). The First, Eleventh, and District of Columbia Circuits have adopted our view, see *Estate of Gilmore v. Buckley,* 787 F.2d 714, 720–23 (1st Cir.1986); *Bradberry v. Pinellas County,* 789 F.2d 1513 (11th Cir.

1986); *Washington v. District of Columbia,* 802 F.2d 1478, 1481–82 (D.C.Cir.1986), and there is also support for it in the Sixth Circuit, see *Janan v. Trammell,* 785 F.2d 557 (6th Cir.1986). These cases are based on the principle that the Constitution is a charter of negative rather than positive liberties; and while there are exceptions to this as to virtually all legal generalizations—exceptions well discussed in Currie, *Positive and Negative Constitutional Rights,* 53 U.Chi.L.Rev. 864 (1986)—none of them is applicable here. The state does not have a duty enforceable by the federal courts to maintain a police force or a fire department, or to protect children from their parents. The men who framed the original Constitution and the Fourteenth Amendment were worried about government's oppressing the citizenry rather than about its failing to provide adequate social services. For such failures, political remedies (along with such legal remedies as states might see fit to provide in their own courts) were assumed to be adequate. The state may not invidiously withdraw its protection from a disfavored minority without violating the equal protection clause in its most fundamental sense, *Bohen v. City of East Chicago,* 799 F.2d 1180, 1190 (7th Cir.1986) (concurring opinion), but that is not suggested in this case.

So we do not think that the plaintiffs can complain that Joshua was deprived of a federal constitutional right to effective protection from his father, but maybe he can complain that the state was complicit in the beatings. The terrible injuries that Joshua sustained, which have essentially immobilized him for life, have deprived him of his liberty within the meaning that the courts have given this word in the due process clauses. See, e.g., *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982); *Ingraham v. Wright,* 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977); *Fernandez v. Leonard,* 784 F.2d 1209, 1214–15 (1st Cir. 1986). The question is whether the state shares responsibility for this deprivation, in a federal constitutional sense, with Joshua's father.

■ We may assume without having to decide that the failure of the Winnebago Department of Social Services to protect Joshua from his father was a sufficiently aggravated form of negligence to escape the bar of *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 665, 667, 88 L.Ed.2d 662 (1986), and *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986), which hold that simple negligence does not violate section 1983. However, if the defendants, though blameworthy, did not cause Joshua's injuries, they cannot be said to have deprived him of his liberty; deprivation implies causation. And if the conduct of the Department of Social Services didn't appreciably increase the probability of Joshua's injuries, then under conventional tort principles of causation (illustrated by *Weeks v. McNulty*, 101 Tenn. 495, 48 S.W. 809 (1898)), which are presumptively applicable to statutory and constitutional torts as well as to common law torts, see, e.g., *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983), and cases cited there, the Department did not cause those injuries.

■ The question how much of an increase in probability is necessary to make an anterior event a "cause" for purposes of tort liability is a vexed problem in the law of torts generally; but we shall not have to explore its outer boundaries in this case; for if the increase in probability is trivial, then under no view of tort liability can the defendant be held to have caused the injury complained of. That is the situation here. This can be seen most clearly by asking whether, if the Department had never existed, Joshua would have sustained the injuries for which he is seeking damages in this suit. The answer, almost certainly, is "yes." For we are supposing a case where the State of Wisconsin has no institutional commitment to preventing child abuse—a gap in its laws that, as we said earlier, would not be actionable in a suit under section 1983. It is unlikely that Ann Kemmeter's well intentioned but ineffectual intervention did Joshua any good at all, but it is most unlikely that it did him any harm. She merely failed to protect him from his bestial father.

■ Of course in any case of a botched rescue attempt it is possible to speculate that the victim would have been better off without the attempt, because it may have impeded competent attempts at rescue that would have succeeded. This is one of the common rationales offered for the common law tort rule that makes a rescuer liable for his negligence in rescuing even if he had no duty to attempt the rescue in the first place. See, e.g., *United States v. Lawter*, 219 F.2d 559, 562 (5th Cir.1955). The rule, however, is broader than this rationale; the plaintiff complaining of the defendant's negligent manner of rescue need not prove that, as a matter of fact, the defendant's failure to complete the rescue made it less probable that someone else would rescue him. See *Jackson v. City of Joliet, supra*, 715 F.2d at 1202–03. Constitutional tort law, however, which ties a defendant's liability to *depriving* the plaintiff of some right, cannot follow this path of expansion. A state can if it wants, whether acting through its courts or its legislature, impose tort duties on persons who fail to rescue someone whose peril they did not cause—whose liberty they did not take away—but a constitutional tort requires deprivation by the defendant, and not merely a failure to protect the plaintiff from a danger created by others. Thus we held in *Jackson v. City of Joliet, supra*, 715 F.2d at 1205—a case in which a policeman waved traffic around a burning car without bothering to look inside (where the plaintiffs' decedents were burning to death) —that a merely conjectural possibility that the state's inaction warned off other potential rescuers is not enough to make the state complicit (in a federal constitutional sense) in the private conduct that caused the victim's injury.

This conclusion is supported by the Supreme Court's holding in *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980), that the fact that state inaction might be deemed a proximate cause of the plaintiff's injury under evolving common law notions is not enough to establish a violation of the Fourteenth Amendment. The states are free in the

administration of their own tort law to attenuate the requirement of causation as far as they want, even to the point, as we have said, of eliminating it entirely; but deprivation in the constitutional sense requires more than a minimal or fictitious causal connection between the action of the state and the injury of the plaintiff. That the state's inaction may have brought about a trivial increase in the probability that Joshua would be severely injured by his father does not enable a conclusion that the state deprived Joshua of his right to bodily integrity.

The botched rescue must be distinguished from the case where the state places the victim in a situation of high risk, thus markedly increasing the probability of harm and by doing so becoming a cause of the harm. If the state, having arrested a child's parents, leaves the child alone in a situation where he is quite likely to come to grief because no one is watching over him, and he is injured, the state is a cause of the injury. That was *White v. Rochford,* 592 F.2d 381 (7th Cir.1979). This case is different. The Department of Social Services did not place Joshua in his father's custody; a Wyoming juvenile court did that. It is true that three days after temporarily placing Joshua in the custody of the hospital to which he was brought in January 1983, the Department returned him to his father. If in doing so the Department was recklessly placing him in a position of great danger, it might be responsible for what ensued—though to hold that it was would require us to take a step beyond *Doe v. New York City Dept. of Social Services,* 649 F.2d 134 (2d Cir.1981), where the welfare department placed a child with foster parents and thus retained custodial responsibility. See *id.* at 141. But there is no evidence that the Department was reckless in returning Joshua to the custody of his father back in January 1983. If at that time the Wisconsin authorities had tried to terminate Randy's parental rights, he might well have sued them under 42 U.S.C. § 1983, charging an unconstitutional deprivation of his rights as a father, as in *Lossman v. Pekarske, supra,* where another Wisconsin father suspected of child abuse brought just

such a suit; or under state law, relying on such cases as *LaChapell v. Mawhinney,* 66 Wis.2d 679, 225 N.W.2d 501 (1975), which held that as a general rule a child's best interests are served by living in a parent's home, rather than in the home of a more distant relative or in a foster home. The recklessness in this case came later, when Ann Kemmeter inexplicably failed to act on mounting, and eventually overwhelming, evidence that Joshua was in great peril from his father. And by then Joshua was back in his father's lawful custody. Had Joshua been a foundling in the custody of the state, which then placed him with foster parents who it knew or strongly suspected would abuse the child, this case would be like *Doe v. New York City Dept. of Social Services, supra,* 649 F.2d at 138–40, 142. But he was not.

■ We reject the proposition embraced by a divided panel of the Third Circuit in *Estate of Bailey by Oare v. County of York,* 768 F.2d 503, 510–11 (3d Cir.1985), that once the state is aware of the danger that a particular child may be abused, a special relationship arises between it and the child and places on the state a constitutional duty to protect the child from the abuse. *Estate of Bailey* (and dicta in *Jensen v. Conrad,* 747 F.2d 185, 190–94 (4th Cir.1984), where, however, the court found it unnecessary to decide whether the facts established a "special relationship," see *id.* at 195; *id.* at 196 (concurring opinion)) is inconsistent with *Bowers, Jackson,* and other cases in this circuit cited earlier. It is also inconsistent with *Estate of Gilmore v. Buckley, supra,* which expressly rejected *Estate of Bailey,* in part in reliance on our decisions in *Beard* and *Jackson.* We can find no basis in the language of the due process clauses or the principles of constitutional law for a general doctrine of "special relationship." See Comment, *Actionable Inaction: Section 1983 Liability for Failure to Act,* 53 U.Chi.L.Rev. 1048, 1061 (1986). It is true that there is a "special relationship" between a prison and its inmates which imposes on the prison a constitutional duty (although a severely limited one) to protect an inmate from the

violence of his fellow inmates, see, e.g., *Ellsworth v. City of Racine,* 774 F.2d 182, 185 (7th Cir.1985); what is special, however, is that the prison authorities, having placed the inmate in a position of danger, cannot shrug off all responsibility when the danger materializes and injury results. That analysis has no force in a case such as this, where the victim was in a position of danger by virtue of the decision of authorities in another state to place him in the custody of his father, a decision in which the defendants in this case were not involved. See *Washington v. District of Columbia, supra,* 802 F.2d at 1481.

The concept of special relationship, when extended as far as the Third Circuit extended it in *Estate of Bailey,* makes it more costly for a state to provide protective services to an individual in need, since by doing so it may be buying itself a lawsuit should its efforts fail. Moreover, the proposition that by once assuming custody of a child a state becomes obligated by federal law to act with some minimum competence in overseeing the child's welfare would if accepted inject the federal courts into an area in which they have little knowledge or experience: that of child welfare. Balancing the rights of parents with those of their children is a task as difficult as it is delicate, and we doubt that it will be performed better under the eyes of federal courts administering constitutional law than by the state judicial and administrative authorities. "The federal courts ... are not local institutions, they do not have staffs of social workers, and there is too little commonality between family law adjudication and the normal responsibilities of federal judges to give them the experience they would need to be able to resolve domestic disputes with skill and sensitivity." *Lloyd v. Loeffler,* 694 F.2d 489, 492 (7th Cir.1982). To place every state welfare department on the razor's edge, where if it terminates parental rights it is exposed to a section 1983 suit (as well as a state-law suit) by the parent and if it fails to terminate those rights it is exposed to a section 1983 suit by the child, is unlikely to improve the welfare of American families, and is not grounded in constitutional text or principle.

AFFIRMED.