**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KIMBERLY KENNEDY, individually
and in her capacity as personal
representative of the estate and as
guardian for her children aka
Kimberly Gorton; JAY D.
KENNEDY, aka JD Kennedy; KEITH
TEUFEL; TERA TEUFEL,
        *Plaintiffs-Appellees,*

      v.

RIDGEFIELD CITY OF, a municipal
corporation and political
subdivision of the State of WA;
NOEL SHIELDS,
        *Defendants-Appellants.*

No. 03-35333

D.C. No.
CV-01-05631-JKA

OPINION

Appeal from the United States District Court
for the Western District of Washington
J. Kelley Arnold, Magistrate Judge, Presiding

Argued and Submitted
September 17, 2004—Seattle, Washington

Filed June 23, 2005

Before: James R. Browning, A. Wallace Tashima, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Browning;
Partial Concurrence and Partial Dissent by Judge Bybee

## COUNSEL

Ray P. Cox, Forsberg & Umlauf, Seattle, Washington, for the defendant-appellant.

John R. Connelly, Jr., Darrell L. Cochran and Lincoln C. Beauregard, Gordon Thomas Honeywell Malanca Peterson & Daheim, Tacoma, Washington, for the plaintiff-appellee.

## OPINION

BROWNING, Circuit Judge:

Defendant Noel Shields appeals the district court's ruling that he is not entitled to summary judgment against Plaintiff Kimberly Kennedy's 42 U.S.C. § 1983 claim. He argues that his alleged conduct did not violate Plaintiff's clearly established constitutional rights. We disagree, and conclude the district court correctly determined that Shields is not entitled to qualified immunity. Accordingly, we affirm the decision below.

### I.   Introduction

Kimberly Kennedy's § 1983 action against Ridgefield City and Ridgefield Police Officer Noel Shields stems from events occurring on September 24, 1998, when a thirteen year-old neighbor, Michael Burns, shot and killed her husband Jay Kennedy and severely wounded her.

On September 6, 1998, Kennedy called the Ridgefield Police Department ("RPD") and alleged that Michael Burns

had molested Kennedy's nine-year-old daughter, Tera Teufel. RPD Officer Shields responded to the call.

Kennedy claims to have warned Shields of Michael Burns's violent tendencies at the September 6 meeting. Kennedy insists that during their initial meeting, she told Shields that the Burns family was unstable and that she had seen a lot of violence in their home. She alleges that she went on to describe several violent incidents involving Angela Burns, Michael's mother. Kennedy also claims she informed Shields that Michael Burns had been involved in a number of violent incidents, including fights at school, lighting a cat on fire, breaking into his girlfriend's house and attacking her with a baseball bat, and throwing rocks at a building in downtown Ridgefield.

Kennedy also alleges that during the September 6 meeting, Shields assured her that she would be given notice prior to any police contact with the Burns family about her allegations. Shields stated that he could not recall whether Kennedy asked to be notified prior to any contact by the authorities with the Burns family.

Shields forwarded his report to the Child Abuse and Intervention Center ("CAIC") following the September 6 meeting. It is undisputed that Shields had no contact with Kennedy between the September 6 meeting and September 24, the night of the shooting.

Kennedy alleges that on several occasions, she inquired into the status of the investigation of Michael Burns and reminded officers to notify her prior to any contact with the Burns family. She learned that Michael Burns had been investigated for sending death threats to a classmate, but that the investigation concluded that he was not responsible. Kennedy asserts that she expressed concerns about her safety and told the CAIC officer handling the investigation that she was anxious to have the investigation started.

On September 24, 1998, Kennedy called both Shields and the CAIC to inquire into the progress of the investigation. Kennedy left a message for Shields. The content of this message is disputed. Shields stated that when he arrived at work on September 24, there was a message from Kennedy inquiring about his contact with Angela Burns and the status of the molestation case. Shields's account clearly contradicts Kennedy's repeated testimony that she asked the RPD and CAIC to notify her prior to any contact with the Burns family. After receiving Kennedy's message, Shields called the CAIC to inquire into the status of the investigation. The officer responsible for the case was out so Shields left a message.

Shields decided to drive to the Kennedy house and inform Kennedy personally that he called the CAIC but did not know the status of the case. Shields stated that he did not call Kennedy before driving to her house. On the way to the Kennedy house, Shields changed his mind and decided to go to the Burns's residence first. He reasoned that it was on the way, and he could thus determine whether the Burns family had been contacted and so inform Kennedy. Shields talked to Angela Burns and informed her of Kennedy's allegations.

After speaking with Angela Burns, Shields proceeded to the Kennedy house. When he arrived, Shields told Kennedy that he had informed Angela Burns of the molestation allegations. Kennedy became upset and asked Shields why he had contacted the Burns family prior to notifying her and told Shields that she was in fear for her safety. Kennedy alleges that Shields assured her that the police would patrol the area around her and Michael's house to keep an eye on him.

After Shields left, Kennedy called a friend because she was very frightened of what Michael and Angela Burns's reaction would be. According to Kennedy, Shields told her Angela Burns was very angry after their conversation and Angela and Michael Burns began yelling at one another. Kennedy also alleges that her husband decided to stay the night at home

because Shields had promised to patrol the premises. They planned to lock the doors to the house and leave town early the next morning. Kennedy also stated that she did not call 911 that night because she relied upon Shields's promise to patrol the area.

Early on the morning of September 25, 1998, Michael Burns broke into the Kennedy house and shot Jay and Kimberly Kennedy while they slept. Jay Kennedy died as a result of his injuries. Michael Burns was convicted of the premeditated murder of Jay Kennedy and attempted premeditated murder of Kimberly Kennedy.

Kennedy brought a lawsuit against Shields and Ridgefield City, among others, in Clark County Superior Court asserting several state causes of action and a claim under 42 U.S.C. § 1983 and the Fourteenth Amendment. The case was removed to the United States District Court for the Western District of Washington. On March 13, 2003, Shields and Ridgefield City moved for summary judgment. The court granted summary judgment to the defendants on all state law claims and to Ridgefield City on Kennedy's § 1983 "failure to train" claim.

The court denied Shields's motion for summary judgment based on qualified immunity. The district court concluded that viewing the facts in a light most favorable to plaintiffs, "a jury could find that Officer Shields unreasonably created a false sense of security in plaintiffs by agreeing to give plaintiffs advanced notice of advising the Burns family of the allegation that Michael Burns sexually molested Tera Teufel, and assuring the plaintiffs of a neighborhood patrol." Order, p. 4-5. This interlocutory appeal followed.

## II. Analysis

This case presents two legal issues. First, we must consider whether this Court has jurisdiction over Shields's interlocu-

tory appeal concerning his qualified immunity defense. If so, we must then determine whether Shields is entitled to qualified immunity under the facts of this case.

We review *de novo* an interlocutory appeal from the denial of summary judgment based on qualified immunity. *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003). In reviewing a summary judgment order in a § 1983 action where the district court determines that "the defendant's alleged conduct violated the plaintiff's clearly established constitutional rights . . . we resolve all factual disputes in favor of the plaintiff . . . ." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 807 (9th Cir. 2003).

## A. Jurisdiction over Qualified Immunity Claims on Interlocutory Appeal

In response to Shields's interlocutory appeal, Kennedy argues first that this Court lacks jurisdiction. We disagree, and conclude that we have jurisdiction to determine whether the trial court erred in holding that Shields was not entitled to qualified immunity.

**[1]** As a general rule, interlocutory appeals from determinations of qualified immunity are permissible. In *Mitchell v. Forsyth*, 472 U.S. 511 (1985), the Supreme Court held that the denial of a defendant's motion for summary judgment is immediately appealable where the defendant is a public official asserting the defense of qualified immunity and the issue appealed concerns whether the facts demonstrated a violation of clearly established law.

**[2]** Kennedy correctly notes that the Court created an exception to this general rule in *Johnson v. Jones*, 515 U.S. 304 (1995). There, the Court held that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'gen-

uine' issue of facts for trial." *Id.* at 319-20. In ruling against Shields's motion for summary judgment based on his claim of qualified immunity, the trial court stated:

> Viewed in a light most favorable to plaintiffs, a jury could find that Officer Shields unreasonably created a false sense of security in plaintiffs by agreeing to give plaintiffs advance notice of advising the Burns family of the allegation that Michael Burns had sexually molested Tera Teufal, and assuring the plaintiffs of a neighborhood patrol. . . . In essence there is a question of fact as to whether or not there was justifiable reliance by plaintiffs on the alleged promises by Shields.

Order at 4-5. Thus, the trial court's order observes that issues of fact remain.

This does not, however, suffice to deprive us of jurisdiction under *Johnson*. In a subsequent case, the Supreme Court explained:

> Denial of summary judgment often includes a determination that there are controverted issues of material fact, see Fed. Rule Civ. Proc. 56, and *Johnson* surely does not mean that *every* such denial of summary judgment is nonappealable. *Johnson* held, simply, that determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case. . . . *Johnson* reaffirmed that summary judgment determinations *are* appealable when they resolve a dispute concerning an 'abstract issu[e] of law' relating to qualified immunity . . . typically, the issue whether the federal right allegedly infringed was 'clearly established.'

*Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996). *See also Knox v. Southwest Airlines*, 124 F.3d 1103, 1107 (9th Cir.

1997) ("[W]e have jurisdiction over an interlocutory appeal from the denial of qualified immunity where the appeal focuses on whether the defendants violated a clearly established law given the undisputed facts, while we do not have jurisdiction over an interlocutory appeal that focuses on whether there is a genuine dispute about the underlying facts.").

Unlike the appeal in *Johnson*, we are not asked or required to look at the sufficiency of the evidence in support of the factual claims made by the parties, i.e., Shields's contention that he did not create a false sense of security and Plaintiff's insistence that he did. *See Johnson,* 515 U.S. at 313 (holding that some orders denying summary judgment, "though entered in a 'qualified immunity' case, determine[ ] only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial. This kind of order, we conclude, is not appealable.").

**[3]** Here, while the trial court concluded that issues of fact remain, those disputed facts are not the basis of Shields's interlocutory appeal of the denial of qualified immunity. Rather, Shields's appeal contends that even after resolving the issues of fact in Plaintiff's favor, the Plaintiff will not have demonstrated that Shields violated a clearly established constitutional right. Because this question represents an "abstract issue of law relating to qualified immunity" it falls within our jurisdiction on interlocutory appeal.

Assuming the facts as alleged by Plaintiff, we must determine whether the Defendant violated Plaintiff's constitutional rights and whether those rights were clearly established. If Shields's conduct did not violate Plaintiff's clearly established constitutional rights, he is entitled to qualified immunity. We now turn to those questions.

## B. Application of Qualified Immunity to Officer Shields

We conclude that Shields's conduct, as alleged by Plaintiff, violated her constitutional rights. Furthermore, we conclude

that the constitutional rights violated by Shields's alleged conduct were clearly established at that time.

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court established a two-prong analysis for qualified immunity cases. First, a court must determine whether the facts alleged (resolving all disputes of fact in favor of the party asserting the injury) show that the officer's conduct violated a constitutional right. "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier*, 533 U.S. at 201. If the court determines that the conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity.

If, however, the court determines that the conduct did violate a constitutional right, the second prong under *Saucier* requires the court to determine whether the violated right was "clearly established." A right is clearly established if the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Even if the violated right is clearly established, the *Saucier* Court recognized that it may be difficult for a police officer to determine how to apply the relevant legal doctrine to the particular circumstances he or she faces. The *Saucier* Court therefore held that if the officer makes a mistake in applying the relevant legal doctrine, he or she is not precluded from claiming qualified immunity so long as the mistake is reasonable. That is, if "the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." 533 U.S. at 205. We now take up those questions.

## 1. First Prong: Did Shields Violate Kennedy's Constitutional Rights?

[4] The Plaintiff alleges that the Defendant violated her 14th Amendment right to substantive due process under the

"state-created danger" doctrine. In *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 196 (1989), the Supreme Court held that the Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." Since the Due Process Clause does not require the state to provide its citizens with a minimum level of security, it follows that the state cannot be held liable for failing to do so. *Id.* at 196-97.

Two exceptions to *DeShaney* exist. Under the "special relationship" doctrine, the state can be held liable for a third party's harm where the state has custody over the plaintiff. Under this exception, " 'when the State takes a person into its custody and holds him there against his will, the Constitution imposes some responsibility for [that person's] safety and general well-being.' " *Wang v. Reno*, 81 F.3d 808, 818 (9th Cir. 1996) (quoting *DeShaney*, 489 U.S. at 199-200). Here, Plaintiff does not allege that Shields ever had custody over her or her husband; consequently, this exception is inapplicable.

[5] The "state-created danger" doctrine represents the second recognized exception to *DeShaney*'s rule against holding state officials liable for private violence. Under this theory, plaintiffs can recover "when a state officer's conduct places a person in peril in deliberate indifference to their safety." *Penilla v. City of Huntington Park*, 115 F.3d 707, 709 (9th Cir. 1997). This Circuit first recognized liability based on state created danger in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989). In *Wood*, a state trooper determined that the driver of an automobile was intoxicated, arrested the driver and impounded the car. The officer left Wood, a passenger in the car, stranded late at night in a high-crime area. Wood accepted a ride from a passing car and was subsequently raped. This Court held that Wood could claim § 1983 liability, since there was a genuine issue of fact "that [the trooper] acted with deliberate indifference to Wood's interest in personal security under the fourteenth amendment." *Id.* at 588.

Since *Wood*, this Circuit has held state officials liable for the creation of danger in a variety of circumstances. In *L.W. v. Grubbs*, 974 F.2d 119, 120 (9th Cir. 1992), this Court found that state employees could be liable for the rape of a registered nurse assigned to work alone in the medical clinic of a medium-security custodial institution with a violent sex offender. In *Munger v. City of Glasgow*, 227 F.3d 1082 (9th Cir. 2000), this Court found that police officers could be held liable for ejecting a visibly drunk patron from a bar on a bitterly cold night.

[6] To find an officer liable under the "state-created danger" theory, a plaintiff must show that the officer's actions created or increased the danger facing him or her. Second, the plaintiff must demonstrate that the state official acted with deliberate indifference to a known or obvious danger. Interpreting the facts in a manner most favorable to Plaintiff, we conclude that Shields did in fact augment the danger Plaintiff and her husband faced and acted with deliberate indifference to a known or obvious danger. Plaintiff has therefore demonstrated that her constitutional rights were violated and so satisfied the first prong under *Saucier*.

### a.   Danger Affirmatively Created or Increased Due to State Action

[7] First, Shields's affirmative actions placed the Kennedy family in a situation of danger greater than they would have faced had he not acted at all. Shields does not dispute that the revelation to Michael Burns's mother of the allegations of sexual abuse against Michael Burns triggered his actions against Plaintiff and her husband. In revealing the existence of allegations against Michael to Angela Burns after having promised Kennedy that he would notify her first, Shields created a situation of heightened danger. It was inevitable that Michael Burns would eventually learn of the allegations made against him, and he would likely infer who had made them. If Kennedy had received the prior warning officer Shields

promised her, she and her family could have taken additional precautions. Instead, they relied on Shields's promise of advance notification and so considered additional precautions unnecessary.

**[8]** Moreover, Shields further augmented this danger by offering false assurances that the police would patrol the Kennedy's neighborhood the night of the shooting. Misrepresentation of the risk faced by a plaintiff can contribute to a finding of state-created danger. *See Grubbs*, 974 F.2d at 121 ("The Defendants also enhanced L.W.'s vulnerability to attack by misrepresenting to her the risks attending her work."). Plaintiff alleges that she and her husband based their decision to remain at home that night and leave in the morning in reliance on Shields's assurances that the neighborhood would be patrolled. Defendant's affirmative promise of a police patrol thus influenced Plaintiff's assessment of the risk she and her family faced.

### b. Deliberate Indifference

Second, resolving all factual disputes in Plaintiff's favor, Shields acted with deliberate indifference. " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Bryan County v. Brown*, 520 U.S. 397, 410 (1997). *See also Christie v. Iopa,* 176 F.3d 1231, 1240 (9th Cir. 1999). Here, Plaintiff has alleged that the consequences of Shields's actions were obvious: first, that once informed of the allegations against him, Michael Burns would attempt to harm the Kennedy family; and second, that having been assured by Shields's promise to provide police protection, the Kennedy family would rely upon that promise.

**[9]** Resolving factual disputes in Kennedy's favor, the record supports her assertion that Shields should have recognized the obvious consequences of his actions. Most significantly, Plaintiff specifically asked Shields to give her advance

notification because she feared for the safety of her family. In addition, Plaintiff herself had previously informed Shields of Michael Burns's violent tendencies, including an incident in which Michael Burns had broken into a girlfriend's home. Shields also knew of a separate investigation in which school authorities suspected (albeit erroneously) that Michael Burns sent death threats to another student. Finally, on the night of the attack, Plaintiff informed Shields directly that he had placed her family in danger by informing the Burns family of the allegations against Michael prior to notifying the Kennedy family. Under these circumstances, the obvious consequence of informing Angela Burns prior to the Kennedy family and of falsely assuring the Kennedy family of police protection was to increase the risk the Kennedy family faced from Michael Burns.

## 2. Second Prong: Was the Right Violated Clearly Established?

When all the factual issues are resolved in Plaintiff's favor, we find Shields's alleged conduct violated Kennedy's constitutional rights. We turn to the second prong of the *Saucier* test, and consider whether the constitutional right violated by Shields's conduct was "clearly established" in September 1998. We conclude for the reasons set out below that it was. To determine whether a right is clearly established, the reviewing court's inquiry must consider whether a reasonable officer would recognize that his conduct violates that right under the circumstances and in light of the law that existed at that time. As the Supreme Court explained:

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held

unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted); s*ee also Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1136-37 (9th Cir. 2003) ("In order to find that the law was clearly established . . . we need not find a prior case with identical, or even 'materially similar' facts."). Thus, the alleged conduct need not explicitly have been previously deemed unconstitutional, but existing case law must make it clear that the conduct violated constitutional norms. Moreover, "[t]he plaintiff bears the burden of showing that the right at issue was clearly established under this second prong." *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).

In September of 1998, it was clearly established that state officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger. In 1989, this Court recognized the theory of state-created danger in *Wood*. However, it is not enough to claim that a constitutional right was clearly established in its broad outlines. First, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). The appropriate level of specificity must take into account the actual circumstances of the case, for the inquiry into whether the right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. In *Saucier*, the Court rejected the idea that the plaintiff could defeat the defendant's claim of qualified immunity merely by demonstrating that use of force violates the Fourth Amendment if it is excessive under objective standards of reasonableness.

**[10]** Kennedy may not defeat Shields's claim of qualified immunity merely by demonstrating that police actions vio-

lated the Fourteenth Amendment if they affirmatively created or enlarged danger facing a plaintiff and did so with deliberate indifference. To satisfy her burden and demonstrate that Shields violated a clearly established constitutional right, Plaintiff must go further. "The salient question . . . . is whether the state of the law [at the time of the alleged wrong] gave respondents fair warning that their alleged treatment of [the petitioner] was unconstitutional." *Hope*, 536 U.S. at 741. That is, Kennedy must demonstrate, based on the state of the law in 1998, that Shields was on notice that informing Angela Burns of Kennedy's allegations prior to warning the Kennedy family and falsely promising a police patrol that evening would violate Kennedy's constitutional rights. Resolving all factual disputes in her favor, we conclude that Kennedy has met this burden. Consequently, we hold that Shields is not entitled to have his motion for summary judgment on the basis of qualified immunity.

[11] Both of Kennedy's claims against Shields amount to verbal promises that were relied upon and then not kept. This Court has previously held officers liable under a state-created danger doctrine where they falsely induce reliance by promising additional protection or warnings. In *Grubbs*, 974 F.2d 119, a registered nurse working at a medium security custodial institution was raped and terrorized by a young male inmate. The nurse brought a § 1983 claim against her supervisors. According to the plaintiff, her employer had told her she would not be working alone with violent sex offenders. Notwithstanding that representation, her employer subsequently allowed an inmate prone to violence against women to work with her unsupervised. The plaintiff, relying upon that representation, did not take all the precautions she might otherwise have taken, and was subsequently raped.

[12] The *Grubbs* Court recognized that cognizable state-created harm claims may arise where state officials induce reliance by means of verbal promises that are later broken. In *Grubbs*, the plaintiff obviously recognized that she faced

some risk, because she was working in a custodial institution with male offenders. She did not realize, however, that the defendants would place her in close unsupervised proximity with an individual with a history of violence against women. It was in part because the conduct of the defendants increased the risk she faced without her knowledge that the *Grubbs* Court found them to have violated her constitutional rights. "Defendants . . . enhanced L.W.'s vulnerability to attack by misrepresenting to her the risks attending her work." *Id.* at 121. Thus, the *Grubbs* Court concluded that officials may be held liable where they claim to offer protection they do not provide and so misrepresent the risk posed by third-parties to a plaintiff. Consequently, Shields's conduct violated Plaintiff's clearly established constitutional right.

Like the plaintiff in *Grubbs*, Kennedy was aware of the underlying risk, yet reasonably underestimated it based on Shields's representations. His alleged conduct both increased and misrepresented the risk that Michael Burns posed to Kennedy and her family. Shields purportedly told Kennedy that he would warn her before telling the Burns family of the allegations against Michael Burns, and then failed to do so. Furthermore, Kennedy has also alleged that Shields falsely told her that he would patrol her neighborhood the night the allegations against Michael Burns were revealed to his family. If either or both of these allegations were proved at trial, a jury could reasonably find Kennedy relied upon such promises of additional protection in evaluating the risks Michael Burns posed to her family. Furthermore, under the circumstances alleged by Plaintiff, Shields would have acted unreasonably in promising prior notification and additional police protection, inducing reliance, and then failing to perform.

## III.   CONCLUSION

Under *Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996), we have jurisdiction to hear Shields's interlocutory appeal regarding qualified immunity. We conclude that Shields

unreasonably violated Kennedy's clearly established constitutional right. Under the state-created danger doctrine, a police officer may be liable for actions that create or augment known or obvious dangers. Here, Shields's actions both increased and misrepresented the risk Plaintiff faced. Under *Grubbs*, increasing and misrepresenting a known risk may give rise to § 1983 liability. This doctrine was clearly established by the time the events of this case took place. Accordingly, the trial court's denial of Shields's motion for summary judgment based on qualified immunity is hereby

AFFIRMED.

BYBEE, Circuit Judge, concurring in part and dissenting in part:

I vigorously part company with the majority's conclusion that Shields created the danger Kennedy faced and then acted with deliberate indifference, thereby violating her rights under the Due Process Clause of the Fourteenth Amendment. The majority's conclusion is unsupported by the record and our own case law. The majority concludes that in the fifteen minutes between the time Officer Shields contacted Angela Burns and the time he advised Kim Kennedy of the contact, he deprived Kennedy of her due process rights. In so doing, the majority not only mangles the state-created danger doctrine, it holds that its new rule was so clearly established that Officer Shields should have known he was violating the Constitution and, thus, has forfeited his qualified immunity.

We have never before recognized a state-created danger cause of action on facts remotely analogous to these. In the sixteen years since we invented the state-created danger exception to *DeShaney*, we have approved it on fewer than five occasions. In these cases we have narrowly construed the exception to encompass only claims in which the govern-

ment's act was directed toward a specific plaintiff, rather than the public at large; the government acted affirmatively, rather than simply failed to act; the government's act caused the harm, rather than merely increased the risk; and the government's action constituted deliberate indifference to the known or obvious danger, rather than mere negligence, or even gross negligence. Ignoring these elements, the majority today extends the state-created danger doctrine to a situation in which it cannot be said with any measure of confidence either that the government's act caused the plaintiff's harm or that the government acted with the requisite level of culpability.

Even if I thought Officer Shields had violated our state-created danger gloss on the Due Process Clause, the violation was surely not so obvious that he should have known at the time that he was violating Kennedy's constitutional rights. Consequently, even assuming a constitutional violation, I would hold that Officer Shields is nonetheless entitled to qualified immunity. I respectfully dissent.[1]

## I.   BACKGROUND

The facts of this case are undeniably tragic. As outlined in Kennedy's complaint, her deposition testimony, and as determined by the district court, these facts show that on September 6, 1998 Kennedy filed a complaint with the City of Ridgefield Police Department ("RPD") accusing her neighbor, Michael Burns, of sexually molesting her nine-year-old daughter. Officer Shields was dispatched to Kennedy's home to record the complaint.

Kennedy recalls talking with Officer Shields about the instability of the Burns family. She alleges that she informed Shields that the Burns family "had bad tempers" and that Michael was in trouble all the time, including one unfruitful

---

[1]Although I dissent on the merits, I agree with the majority's conclusion that we have jurisdiction to hear this interlocutory appeal.

investigation for allegedly sending a death threat to a class-mate; he also once threw rocks at his stepfather's building. On another occasion, Michael reportedly lit a cat on fire, and later unlawfully entered his girlfriend's house "and went after her with a baseball bat" after she broke up with him. On the basis of this alleged misconduct, Kennedy requested prior notification before the Burns family was informed of her allegations.

Following her initial complaint, Kennedy repeatedly contacted RPD — at least six times during the eighteen days following her complaint — regarding the status of the investigation. On September 24, Kennedy called Officer Shields directly to determine whether the Burns family was aware of her allegations. Unable to reach Shields by phone, she left a message. In response to her inquiry, Shields proceeded to the Burns' home to ascertain whether the family had been notified. Shields was greeted by Angela Burns (Michael Burns's mother) and Shields asked her whether she had received a phone call or visit from the Child Abuse and Intervention Center ("CAIC"). Angela Burns inquired as to the reason for his question, and Shields advised Angela of the allegations.

Immediately following this meeting, Shields drove directly to Kennedy's residence — located approximately one block away — and informed her that Angela Burns had been notified of her allegations. Kennedy alleges that she expressed fear regarding Michael Burns's possible reaction. She further alleges that, in response to her expressions, Officer Shields promised to increase surveillance in the area that night to watch for Michael. After discussing the matter with her husband, Kennedy chose to remain in her home that evening and leave town the following morning. Michael Burns entered the Kennedy home that night, shot and killed Jay Kennedy and seriously wounded Kim Kennedy. She now brings this action against Officer Shields, claiming that his conduct violated her rights under the Due Process Clause of the Fourteenth Amendment.

## II. *SAUCIER* TWO-STEP

The Court's opinion in *Saucier v. Katz*, 533 U.S. 194 (2001), as the majority notes, provides the framework for our analysis of this § 1983 suit. Under this framework, if a defendant claims qualified immunity, we must make two distinct inquiries: a "constitutional inquiry" and a "qualified immunity inquiry." *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002).

Officer Shields claims that he is entitled to qualified immunity from Kennedy's suit. Accordingly, *Saucier* instructs that we must first determine whether, "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 201-02 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

The majority concludes that Kennedy's allegations permit a jury to find that Officer Shields's conduct deprived her of due process as guaranteed by the Fourteenth Amendment on the theory that Shields affirmatively created the danger that injured her and took her husband's life. The majority holds, in addition, that Officer Shields is not entitled to qualified immunity for this violation. I disagree on both accounts. To explain my disagreement on the first point, it is worth briefly outlining our court's gloss on *DeShaney* and the Fourteenth Amendment's Due Process Clause.

### A. *State-Created Danger Doctrine*

As the majority observes, the state-created danger doctrine is said to trace its jurisprudential pedigree to the Supreme

Court's opinion in *DeShaney*, perhaps best known for Justice Blackmun's exclamation, "Poor Joshua!" *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 213 (1989) (Blackmun, J. dissenting). Declining to find a due process violation where local officials failed to adequately respond to complaints that four-year-old Joshua was being abused by his father, the Court held that the Constitution does not require the state to protect the life, liberty, and property of its citizens against invasion by *private* actors. Rather, the Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.* at 195. The Court observed,

> Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression[.] Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes. Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual. . . . [I]t follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.

*Id.* at 196-97 (internal quotation marks and citations omitted).

We have noted two distinct exceptions to the general rule that the state has no affirmative duty to protect persons from violence inflicted by private actors: (1) the "special relationship" exception, stemming from a custodial relationship

between the state and the victim; and (2) the "danger creation" exception, stemming from "affirmative conduct on the part of the state in placing the plaintiff in danger." *L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir. 1992) ("*Grubbs I*"). The former emanates from explicit language in *DeShaney* itself. *DeShaney*, 489 U.S. at 199-200 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being"). The latter, more amorphous, doctrine of "state-created danger" was developed by lower courts in response to the Court's observation, in *DeShaney*, that Winnebago County neither helped to create the dangers that Joshua faced nor rendered him more vulnerable to those dangers. *DeShaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers that Joshua faced . . . it played no part in their creation, nor did it do anything to render him any more vulnerable to them.").

### 1. Ninth Circuit Cases

Four months after *DeShaney*, we established the state-created danger theory, recognizing a cognizable due process violation where the plaintiff alleged that she was raped after a state trooper impounded the vehicle in which she was riding, ejected her from the vehicle, and left her stranded in a high-crime area in the middle of the night. *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989). In holding that Wood raised a triable issue of fact as to whether Trooper Ostrander's conduct violated her substantive due process rights, we drew a distinction between facts demonstrating that police action created the danger to the person and facts demonstrating a danger that existed without police action. *Wood*, 879 F.2d at 589-90. Relying on *Deshaney*, we held that a substantive due process claim could be stated when police create the danger to an individual. We reasoned that "[t]he fact that Ostrander arrested [the driver], impounded his car, and apparently stranded Wood in a high-crime area at 2:30 a.m. distinguished

Wood from the general public and triggered a duty of the police to afford her some measure of peace and safety." *Id.* at 590. Reversing the district court's summary judgment for defendants, we concluded that the plaintiff's allegations demonstrated "an assertion of government power which . . . tends to show a disregard for [her] safety amounting to deliberate indifference." *Id.* at 588.

We further defined the contours of the state-created danger theory in *Grubbs I*, in which a registered nurse employed by the state of Oregon at a medium-security custodial institution brought suit against state prison officials after she was battered, kidnaped, robbed and raped by an inmate with known violent propensities. 974 F.2d at 120. The plaintiff alleged that she was led to believe that she would not have to work alone with residents who were known violent sex offenders. *Id.* Finding a cognizable due process violation, we emphasized that the state had knowledge of the inmate's dangerous propensities, and it affirmatively assigned him a job in which he would work alone with the plaintiff. *Id.* at 121. We concluded that the defendants, like the officer in *Wood*, "used their authority as state correctional officers to create an opportunity for [the inmate] to assault [the plaintiff] *that would not otherwise have existed.*" *Id.* (emphasis added). We further observed that the defendants "enhanced [the plaintiff's] vulnerability to attack by misrepresenting to her the risks attending her work;" namely, by leading her to believe that she would not be assigned to work alone with any inmates who were known violent sex offenders. *Id.*

Contrary to the majority's suggestion, the "enhanced vulnerability" that ensued from the state's misrepresentation of the risks that the nurse would face in her employment did not, by itself, give rise to the due process violation recognized in *Grubbs I*. Maj. Op. at 7485, 7489. Indeed, under *DeShaney*, it is, at the very least, questionable whether a state's failure to fully apprise an individual of the risks attending her employment can ever constitute an affirmative exercise of

state power sufficient to give rise to a due process violation. *See DeShaney*, 489 U.S. at 201-02 (suggesting that the affirmative exercise of state power, as opposed to mere inaction, is the minimum threshold requirement necessary to establish a due process violation, and declining to find such affirmative exercise even in the context of an elaborate and exclusive system of child-protection services). Rather, *Grubbs I* more accurately stands for the proposition that in order to state a claim based on state-created danger the state must affirmatively play a part in creating the danger. *See Grubbs I*, 974 F.2d at 121 ("The 'danger creation' basis for a claim . . . necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger."). *See also Munger v. City of Glasgow Police Dept.*, 227 F.3d 1082, 1086 (9th Cir. 2000) (noting that the court in a state-created danger case "must determine whether [the state] did in fact affirmatively place [the plaintiff] in danger").

On appeal from our remand of *Grubbs I* to the district court, we addressed the level of culpability required to prevail under a state-created danger theory. *See L.W. v. Grubbs*, 92 F.3d 894 (9th Cir. 1996) ("*Grubbs II*"). Explicitly rejecting a "gross negligence" standard, we held that "the plaintiff must show that the state official participated in creating a dangerous situation, and acted with *deliberate indifference to the known or obvious danger* in subjecting the plaintiff to it." *Id.* at 900 (emphasis added). *See also Wood*, 879 F.2d at 588.

In an effort to further demarcate the outer-bounds of the state-created danger doctrine, our subsequent cases have only highlighted the requirement that, at a minimum, a state-created danger due process claim must have as its basis the affirmative exercise of state power creating a risk which, but for the state's affirmative action, would not have existed. For instance, in *Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997), we found a due process violation where police officers responded to a 911 call, "examined [the plaintiff], found him to be in grave need of medical care, canceled

the request for paramedics, broke the lock and door jamb on the front door of [the plaintiff's] residence, moved him inside the house, locked the door, and left." *Id.* at 708. Under these circumstances, we determined that the state created a danger to the plaintiff which, but for its affirmative unlawful acts, would not have existed. Likewise, in *Munger*, we found a cognizable due process violation where police officers ejected the plaintiff from a bar late at night when the outside temperatures were subfreezing. 227 F.3d at 1087. Although the officers knew that the plaintiff was intoxicated and was wearing only a t-shirt and jeans, they prevented him from driving his truck or reentering the bar. *Id.* at 1086-87. Presented with these facts, we held that the state affirmatively acted to place the plaintiff in danger that would not have existed without state action. *Id.* at 1087.

In those cases where we have declined to find a cognizable due process violation, we have generally emphasized the unforeseeable nature of the plaintiff's injuries, that the danger facing the plaintiff existed independent of state action, or the absence of the requisite mental state. For instance, in *Huffman v. County of Los Angeles*, 147 F.3d 1054, 1061 (9th Cir. 1998), we declined to find municipal liability under § 1983 where the plaintiff was shot during a barroom brawl with an off-duty deputy employed by the Los Angeles County Sheriff's Department. Finding the risk to the plaintiff an unforeseeable consequence of a county policy requiring off-duty officers to carry a firearm, we held that "the danger-creation plaintiff must demonstrate, at the very least, that the state acted affirmatively, and with deliberate indifference, in creating a foreseeable danger to the plaintiff, leading to the deprivation of the plaintiff's constitutional rights." *Id. See also Lawrence v. United States*, 340 F.3d 952, 957 (9th Cir. 2003) (citing *Wood*, *Penilla* and *Munger*, and observing that "in each of the cases in which we have applied the danger-creation exception, ultimate injury to the plaintiff was foreseeable."). Similarly, in *Lawrence*, 340 F.3d at 954, we declined to find a Fifth Amendment violation in a *Bivens*

action where a juvenile plaintiff alleged that she was sexually abused by a convicted drug offender participating in the Federal Witness Security Program; the plaintiff alleged that the offender could not have obtained employment at a group home where she was a resident but for the assistance of federal officers. Although we found it foreseeable that a convicted drug offender might attempt to distribute illegal drugs to children with whom he came into contact, we found the plaintiff's injuries an unforeseeable consequence of the official action. *Id.* at 957.

Finally, in *Nicholas v. Wallenstein*, 266 F.3d 1083 (9th Cir. 2001), we declined to find that a county jail commander acted with deliberate indifference to the known or obvious dangers facing his employees when he disclosed their identities as persons who had been involved in the restraint and removal of a deceased prisoner. The deceased prisoner's family and friends believed that personnel connected with the jail were responsible for his death, and, upon learning their identities, harassed and assaulted the employees. *Id.* at 1085-86. Citing *Wood*, the employees contended that their supervisors demonstrated deliberate indifference by not promptly notifying them of the release of the records containing their identities and by not taking steps to protect them from dangers that ultimately became apparent. *Id.* at 1087. We affirmed the district court's grant of summary judgment for defendants, reasoning that the jail authorities could not have reasonably concluded that the prisoner's family and friends would be likely to engage in open violence.[2]

---

[2]There may be some latent dispute regarding whether the "proximate cause" requirement noted in *Huffman*, 147 F.3d at 1061, and *Lawrence*, 340 F.3d at 954, is in addition to, or a mere rephrasing of, the requirement that the danger to the plaintiff must have been "known or obvious" and the state actor must have acted with deliberate indifference to the danger. *See, e.g.*, *Grubbs II*, 92 F.3d at 899-900. Nonetheless, for purposes of the instant case, the relevance of *Huffman*, *Lawrence* and *Wallenstein* derives simply from their recognition that traditional causation principles are not wholly suspended in the context of a constitutional tort suit premised on state-created danger.

### 2. Factors for Analysis

As our cases illustrate, we typically consider a number of factors in determining whether the plaintiff has successfully stated a due process violation: (1) whether the act was directed toward a specific plaintiff or the public at large, *see, e.g.*, *Wood*, 879 F.2d at 590 (reasoning that the state's action "distinguish[ed] [the plaintiff] from the general public and trigger[ed] a duty of the police to afford her some measure of peace and safety"); *cf. Huffman*, 147 F.3d at 1061 & n.4 (expressing doubt as to whether the plaintiff must show that "the danger created by a state official is directed toward a particular plaintiff, as opposed to being directed toward the general public"); (2) whether the government acted affirmatively or simply failed to act, *see, e.g.*, *Grubbs I*, 974 F.2d at 121 (requiring "affirmative conduct on the part of the state in placing the plaintiff in danger"); *Munger*, 227 F.3d at 1086 (phrasing the inquiry as "whether [the state] did in fact affirmatively place [the plaintiff] in danger"); (3) whether the government's act caused the harm, *see, e.g.*, *Grubbs I*, 974 F.2d at 121 (finding state-created danger where the state's action "create[d] an opportunity for [the inmate] to assault [the plaintiff] *that would not otherwise have existed*" (emphasis added)); *Penilla*, 115 F.3d at 708 (same); *Munger*, 227 F.3d at 1087 (same); and (4) whether the government acted with the requisite culpability, *see, e.g., Grubbs II*, 92 F.3d at 899-900 (requiring the plaintiff to show that the state official "acted with *deliberate indifference* to the known or obvious danger" (emphasis added)). *Cf. Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1264 (10th Cir. 1998) (adding a fifth factor which considers whether the government completely removed all of the plaintiff's protection); *Russell v. Gregoire*, 124 F.3d 1079, 1093 n.10 (9th Cir. 1997) (stating, in dicta, that "a state has no general duty to protect individuals against potential harm by third parties unless the state creates the danger and removes the individual's ability to protect himself" (citations omitted)) . These factors closely parallel those used by other circuits recognizing the doctrine. *See, e.g.*, *Uhlrig v.*

*Harder*, 64 F.3d 567, 573 (10th Cir. 1995) (requiring the plaintiff to show that (1) he "was a member of a limited and specifically definable group; (2) Defendants' conduct put [him] and the other members of that group at substantial risk of serious, immediate and proximate harm; (3) the risk was obvious or known; (4) Defendants acted recklessly in conscious disregard of that risk; and (5) such conduct, when viewed in total, is conscience shocking."). My disagreement with the majority's findings and conclusions centers on the second, third and fourth factors.

While the Supreme Court has yet to recognize the state-created danger doctrine, and the circuit courts have yet to construct a unified approach either to the state-created danger inquiry or to the role that causation principles should play in the analysis, each court recognizing the theory has required, at a minimum, a showing that the government's act was the "but-for cause" that put the plaintiff in a position of danger she would not otherwise have faced. *See, e.g.*, *Carlton v. Cleburne County*, 93 F.3d 505, 508 (8th Cir. 1996) (collecting cases and noting that in each case where a cognizable due process violation was found "the individuals would not have been in harm's way but for the government's affirmative actions."); *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993) (finding the evidence sufficient to support summary judgment for police officers where "without state intervention, the same danger would exist"); *Salas v. Carpenter*, 980 F.2d 299, 309-10 (5th Cir. 1992) (holding the City not liable for declining assistance from a SWAT team and taking a hard line with a hostage taker); *Jackson v. City of Joliet*, 715 F.2d 1200, 1204-05 (7th Cir. 1983) (holding officers not liable because they "did not create but merely failed to avert danger" by not rescuing victims more promptly from a burning car). We have never recognized a state-created danger where the state was merely a "proximate cause" rather than the cause-in-fact of the plaintiff's injuries. We have not imported common law tort principles to this doctrine. As the Court observed in *DeShaney*, "It may well be that, by voluntarily

undertaking to protect [the plaintiff] against a danger it con-
cededly played no part in creating, the State acquired a duty
under state tort law to provide him with adequate protection
against that danger. . . . But the claim here is based on the Due
Process Clause of the Fourteenth Amendment, which, as we
have said many times, does not transform every tort commit-
ted by a state actor into a constitutional violation." 489 U.S.
at 201-02 (citations omitted). In short, our cases, as well as
those of our sister circuits, demand that the state's affirmative
act must, at the very least, be the cause-in-fact of the plain-
tiff's injury.

My motive for further belaboring the federal reports with
a dissent stems primarily from my conviction that Kennedy
has not alleged facts sufficient to support a due process viola-
tion, and her case against Officer Shields sounds in negli-
gence, albeit negligence with tragic consequences. The
majority has run afoul of our own cases and the Court's cau-
tion in *DeShaney*. I address these issues more fully below.

## B.   *Constitutional Inquiry*

The majority finds fault of constitutional magnitude with
two of Officer Shields's actions: (1) notifying Angela Burns
of Kennedy's allegations prior to informing Kennedy that he
was about to do so; and (2) promising to increase police sur-
veillance on the night of the shooting. Maj. Op. at 7489. Nei-
ther of these will support a due process violation.

### 1.   Notification

The majority concludes that Officer Shields in fact "aug-
ment[ed] the danger Plaintiff and her husband faced" by
revealing the existence of allegations against Michael to
Angela Burns after having promised Kennedy that she would
be notified first. Maj. Op. at 7484.[3] The majority asserts that,

---

[3]Kennedy did not specify how much advance warning she desired, but
she insists that she expected to be notified before the Burns were informed
of her allegations.

had she received prior warning, she and her family would have had the opportunity to take additional precautions. *Id.* at 7484-85. The majority reaches this conclusion despite the fact that the Kennedys made a conscious choice to remain in their home for approximately eight hours after they were informed of the contact. Nonetheless, in light of the information Kennedy communicated to Officer Shields regarding Michael's past misbehavior, the majority holds that "the obvious consequence of informing Angela Burns prior to the Kennedy family and of falsely assuring the Kennedy family of police protection was to increase the risk the Kennedy family faced from Michael Burns." *Id.* at 7486.

Nothing in the record supports the claim that Shields's act of notifying Angela Burns of the allegations increased the risk facing the Kennedy family. Notifying Michael Burns was an inevitable consequence of Kennedy's allegations of child molestation. At some point either the police or CAIC was going to have to talk with the Burns about the allegations. Kim Kennedy not only knew this, she contacted police at least six times to find out if the Burns had been contacted. Kennedy was anxious because she feared what Michael might do, and she knew that he would have to be informed.

Pursuant to an inter-local agreement, after Kennedy made her initial complaint to the Ridgefield Police Department ("RPD"), the task of investigating the complaint was performed solely by a separate law enforcement unit, the Child Abuse Intervention Center ("CAIC"). As her only direct contact, prior to the shooting, had been with Officer Shields and the RPD, Kennedy had absolutely no way of ensuring that she received notification before CAIC made contact with the Burns family regarding her allegations. Indeed, Officer Shields represented her best chance of receiving prompt notification of any contact with the Burns. By Kennedy's own testimony, Officer Shields informed her immediately after contact was made, at approximately 4:30 in the afternoon.

The majority's holding that Shields's conduct "increase[d] the risk" facing the Kennedy family ignores the fact that the Kennedys were already exposed to a very real risk of danger of which they were aware. *Id.* at 7486. Contrary to the majority's holding, the real danger facing the Kennedy family more accurately stemmed from the likelihood that either the police or CAIC would contact the Burns without informing Kennedy. Consequently, the danger facing the Kennedy family existed apart from any action or conduct by Officer Shields. Rather than increase the risk facing the Kennedy family, Shields's prompt notification appears to have given Kennedy her best chance for escape.

Yet, even assuming that we could disregard these obstacles to find some increased risk attributable to Officer Shields, this would not suffice to support a constitutional violation. To find a cognizable due process violation we must find more than a mere increase in the risk facing the plaintiff. *See, e.g.*, *Huffman*, 147 F.3d at 1061 ("The danger-creation exception to *DeShaney* does not create a broad rule that makes state officials liable under the Fourteenth Amendment whenever they increase the risk of some harm to members of the public."). We must determine that Officer Shields "used [his] authority . . . to create an opportunity for [Burns] to assault [the plaintiff] *that would not otherwise have existed*." *Grubbs I*, 974 F.2d at 121 (emphasis added). In other words, we must conclude, at a minimum, that, but for the state's action, the dangerous situation facing Kennedy would not have existed. Here we cannot do so for the same reasons that we cannot determine that the state "increased" the risk facing Kennedy: the danger that Michael Burns would learn of Kennedy's accusations existed independent of any action attributable to Officer Shields.

An additional obstacle to the majority's conclusion stems from the requisite level of culpability necessary to establish a due process violation premised on state-created danger. In order to find a due process violation, we must determine that

the shooting was a known or an obvious consequence of Officer Shields's action, and that Officer Shields "acted with *deliberate indifference* to the known or obvious danger in subjecting the plaintiff to it." *Grubbs II*, 92 F.3d at 899-900 (emphasis added). *See also Wood*, 879 F.2d at 588. The majority fails to explain how Officer Shields's conduct meets this stringent culpability requirement. Rather, the majority simply asserts that "Shields should have recognized the obvious consequences of his actions." Maj. Op. at 7485. Even if Officer Shields knew of Michael Burns's propensities — the allegations that he had threatened a classmate, tortured a cat, and assaulted his girlfriend — Shields could not have anticipated as an "obvious consequence" that Michael would enter the Kennedys' home to murder Jay and assault Kim.

The majority's conclusion sounds in negligence. Negligence, even gross negligence, is insufficient to establish a due process violation based on state-created danger. *See Grubbs II*, 92 F.3d at 898. *See also DeShaney*, 489 U.S. at 201-02. Instead, the deliberate indifference standard that we quoted with approval in *Grubbs II* requires a showing that the " 'defendant recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks without regard to the consequences to the plaintiff.' " *Grubbs II*, 92 F.3d at 899 (quoting *Uhlrig*, 64 F.3d at 573 n.8). Phrased another way, the defendant must "have actual knowledge of, or willfully ignore, impending harm," meaning "the defendant knows that something *is* going to happen but ignores the risk and exposes someone to it." *Grubbs II*, 92 F.3d at 900 (emphasis in original).

The specific instances of misconduct communicated by Kennedy were not sufficient to put Officer Shields on notice that Michael Burns might attempt to murder members of the Kennedy family. Michael's previous misconduct included disturbing juvenile violence, but had never included threats or assault with a firearm. Indeed, the record suggests that *both* Shields and Kennedy failed to appreciate the extent of the

danger that Michael posed. Under these circumstances, it cannot be said that Officer Shields had "actual knowledge of, or willfully ignore[d], impending harm." *Id.*

Even assuming, however, that Shields recognized the risk, his actions can hardly be said to demonstrate an intent to expose Kennedy to this risk without regard to the consequences. Kennedy contacted police no fewer than six times after her initial complaint, each time inquiring as to whether the Burns had been notified of her allegations. However misguided, Shields's actions appear to have been motivated by a desire to promptly notify Kennedy of any contact that CAIC had made with the Burns. The brevity of the majority's analysis on this point stems from the fact that there is simply no evidence to suggest an *intent* to expose Kennedy to a known or obvious risk, without regard to the consequences that would follow. Without the requisite mental state, there can be no constitutional violation premised on state-created danger. *See*, *e.g.*, *Grubbs II*, 92 F.3d at 898; *Wood*, 879 F.2d at 588.

When one considers the alternative course of conduct which could have spared Shields from the outcome today, the artificiality of the majority's analysis is apparent. Under the majority's theory, Shields would face no liability if he simply reversed the order in which he visited the residence of the plaintiff and her would-be assailant. Or if he had simply called Kim Kennedy from his cell phone while standing at the doorstep of the Burns' home, his action, under the majority's view, would have been blameless. Yet, by driving to the Burns' residence and then immediately to the Kennedys', Shields crossed the majority's new constitutional line in the sand. According to the majority, this flipflop of no more than fifteen minutes is of constitutional magnitude. I cannot agree. Rather, I would hold that Kennedy failed to state a constitutional violation arising from the prompt notification that she received regarding Shields's contact with Angela Burns.

## 2. Promised Police Surveillance

Officer Shields's assurances of an increased police patrol on the evening of the shooting similarly fail to provide a basis for a due process violation. Notably, Kennedy does not claim that the RPD failed to patrol the area on the evening of the shooting. Rather, she appears to contend that Officer Shields's assurances falsely led her to believe that it was safe to remain in her home. Kennedy was in a far better position to ascertain the extent of the risk she and her family faced as a result of Michael Burns's knowledge of her accusations. Yet, the majority asserts that a jury could find in her favor solely on the basis of Shields's alleged misrepresentation of "the risk that Michael Burns posed to Kennedy and her family." Maj. Op. at 7489 ("If *either* . . . of these allegations were proved at trial, a jury could reasonably find Kennedy relied upon such promises of additional protection in evaluating the risks that Michael Burns posed to her family.") (emphasis added).

I have been unable to locate a single case in which a mere misrepresentation of the extent of danger posed to a plaintiff is sufficient to state a claim under the Fourteenth Amendment. *Grubbs I* provides no support for this assertion. On the contrary, the court in *Grubbs I* relied on the state's misrepresentation merely as a means for bolstering its conclusion that the state's affirmative act of directly placing the plaintiff in a dangerous situation — namely, assigning her to work alone with a known violent sex offender — created a risk that would not otherwise have existed. *See Grubbs I*, 974 F.2d at 121. *See also Munger*, 227 F.3d at 1086 (noting that the court in a state-created danger case "must determine whether [the state] did in fact affirmatively place [the plaintiff] in danger"). Kennedy's allegations cannot be elevated to meet this threshold requirement simply because she asserts that she remained in her home based on Officer Shields's misrepresentation of the risk that she and her family faced.

The majority today holds that an officer's mere awareness of a danger to the victim and his expression of intent to help

are sufficient to establish a due process violation. This conclusion belies the central lesson of *DeShaney*. In *DeShaney*, the county was undoubtedly aware of the danger facing Joshua: authorities were repeatedly informed that he was a probable victim of physical abuse over a period of two years, during which time he was treated by emergency room doctors for suspicious injuries on at least three occasions; social workers assigned to his case likewise reported numerous suspicious injuries. The county unequivocally expressed its desire to help Joshua, attempting on multiple occasions to intervene. A Child Protection Team was assembled to assess Joshua's situation, interview the father, and recommend action, and a case worker was assigned to monitor his home environment for six months. *DeShaney*, 489 U.S. at 192-93. Indeed, Winnebago County's knowledge of Joshua DeShaney's plight and its expressions of intent to help him were far greater than the City of Ridgefield's knowledge of Kennedy's plight and its expressions of intent to help her. *See Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 700 (9th Cir. 1990) (citing *DeShaney* and declining to find a due process violation where the plaintiff's allegations amounted to the assertion that "state actors knew of her plight and affirmatively committed to protect her"). We are not permitted to circumvent the Court's ruling in *DeShaney* simply by redefining the cause of action as one premised on a "state-created danger." The City of Ridgefield did not create Michael Burns's violent reaction any more than Winnebago County created the violent beatings that resulted in brain damage so severe that Joshua DeShaney "is expected to spend the rest of his life confined to an institution for the profoundly retarded." *See DeShaney*, 489 U.S. at 193.

The majority's new rule comes perilously close to adopting for the Due Process Clause the tort principle that if police undertake to perform a service not mandated by the Constitution, then adequate performance of the service voluntarily assumed is constitutionally required. It is anomalous to impose liability for failing in an effort not required by the Constitution. *See, e.g., DeShaney*, 489 U.S. at 201-02;

*Andrews v. Wilkins*, 934 F.2d 1267, 1270-71 (D.C. Cir. 1991). More troubling in my view, however, is the potential for perverse incentives; if liability is the logical result of anything less than complete success, police will naturally be hesitant to respond at all when faced with a situation such as Kennedy's. The result is less police protection, not more. This consequence is dangerous and, I believe, unnecessary.

In sum, I would hold that Kennedy failed to establish a due process violation arising from Officer Shields's actions either in notifying the Burns of her allegations prior to warning her, or offering to increase surveillance on the evening of the shooting. Accordingly, I would hold that she failed to establish a cognizable due process violation premised on state-created danger.

## C.   *Qualified Immunity Inquiry*

Even assuming, as the majority maintains, that Kennedy has established a due process violation premised on state-created danger, in order to bind this case over for trial we must determine that the constitutional right at issue was "clearly established" at the time of the events in question. We must hold that a "reasonable official" in Officer Shields's position "would understand that what he is doing violates that right," *Saucier*, 533 U.S. at 202, keeping in mind that "officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law." *Butz v. Economou*, 438 U.S. 478, 507 (1978). Indeed, "[e]ven defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard." *Davis v. Scherer*, 468 U.S. 183, 190 (1984). As the Court has repeatedly emphasized, "the qualified immunity defense . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 342 (1986). *See also Burns v. Reed*, 500 U.S. 478, 494-95 (1991). Particu-

larly in a context where the potential for liability may chill lawful and socially desirable behavior at the edge of the "forbidden zone," qualified immunity ensures that "officials can act without fear of harassing litigation" and "can anticipate when their conduct may give rise to liability for damages." *Davis*, 468 U.S. at 195.

Imbued with notions of "reasonableness" and "fair warning," the "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [official] conduct." *Saucier*, 533 U.S. at 205. The central dispositive inquiry essential to finding a right "clearly established" is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. Importantly, our analysis must acknowledge and evaluate the specific context of the situation confronted by the official. *Id. See also Brosseau v. Haugen*, ___ U.S. ___, ___, 125 S.Ct. 596, 599 (2004) ("It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " (quoting *Saucier*, 533 U.S. at 201)). With this perspective in mind, I would hold that Officer Shields is entitled to qualified immunity.

Citing only our decision in *Grubbs I*, the majority holds that "Shields was on notice that informing Angela Burns of Kennedy's allegations prior to warning the Kennedy family and falsely promising a police patrol that evening would violate Kennedy's constitutional rights." Maj. Op. at 7488. *Grubbs I* did not even begin the heavy lifting necessary to sustain the majority's conclusions in this case.

While perhaps superficially similar on some level, several key facts that were present in *Grubbs I* are missing from this case. The prison nurse who was battered, kidnaped, robbed and raped by an inmate in *Grubbs I* was led to believe that she would not have to work alone with residents who were known violent sex offenders. 974 F.2d at 120. *Grubbs I*, thus,

involved a plaintiff who was completely unaware of the risks she faced and a state defendant fully apprised of the danger. Kennedy, on the other hand, possessed superior knowledge of the danger she faced from Michael Burns, and Officer Shields never assured her that the danger of which she was aware no longer existed. Even according to Kennedy's own testimony, Shields merely offered to increase surveillance in the neighborhood on the evening of the shooting.

*Grubbs I* also involved affirmative conduct, on the part of the state, which created a risk that otherwise would not have existed. We concluded that, by assigning the nurse to work alone with a sexually violent prisoner, the defendants "used their authority as state correctional officers to create an opportunity for [the inmate] to assault [the plaintiff] *that would not otherwise have existed*." *Id*. at 121 (emphasis added). The same cannot be said of Kennedy's complaint; indeed, the record suggests precisely the opposite. As reflected in Kennedy's repeated calls to the RPD, the danger facing her family stemmed from the probability that CAIC would begin the investigation without ever communicating as much to her. This risk existed apart from any action attributable to Officer Shields. In short, I cannot join the majority's holding that *Grubbs I* put Officer Shields on notice that by responding to Kennedy's phone message, informing Angela Burns of Kennedy's allegations, immediately notifying Kennedy of as much and offering to increase surveillance in the neighborhood, he was acting with deliberate indifference to a known or obvious danger.

No case of which I am aware, either in our circuit or any other, has found a cognizable due process violation on facts remotely analogous to these. On the contrary, in the case closest to this one, we concluded that the plaintiff could *not* establish a due process violation. *See Nicholas v. Wallenstein*, 266 F.3d 1083 (9th Cir. 2001). The facts of *Wallenstein* are strikingly similar: A state officer released the plaintiffs' identities to an angry group of family and friends; plaintiffs were imme-

diately harassed and assaulted. *Id.* at 1084-85. The plaintiffs argued that the release "was done with deliberate indifference to the danger to them and that this indifference continued in the refusal of the defendants to afford them protection from the danger." *Id*. We concluded that "[a]t the moment [the state official] released the incident reports he knew that the crowd to whom he was releasing them believed that personnel connected with the jail had killed" the deceased prisoner and that the release of this information "would excite the crowd." *Id*. at 1087. Yet, when presented with these facts, only three years ago, we held that the "plaintiffs failed to produce evidence that would create a triable issue of material fact showing that the danger was known or obvious to the defendants." *Id*. at 1085. What we stated there bears repeating here: "Knowing that the crowd was angry was not knowing that they would take criminal measures to make the jailors or their health helpers pay." *Id*. at 1087.

Moreover, since we first recognized the state-created danger doctrine, we have always drawn a sharp distinction between facts demonstrating that police action created the danger to the person and facts demonstrating a danger that existed without police action. *See Wood*, 879 F.2d at 589-90. In addition, since *Grubbs II* we have required plaintiffs to meet a stringent culpability requirement designed to prevent the imposition of § 1983 liability for negligent conduct, even grossly negligent conduct. 92 F.3d at 899-900. And since *Huffman*, 147 F.3d at 1061, and *Lawrence*, 340 F.3d at 957, we have emphasized that the requisite culpability must relate to consequences which were foreseeable. The majority's conclusion in this case does not simply whittle away at these requirements; it completely reinvents them.

Consequently, I cannot envision how it "would be clear to a reasonable officer that his conduct was unlawful" in the situation at issue in this case. *Saucier*, 533, U.S. at 202. Assuming *arguendo* that Kennedy's allegations are sufficient to state a constitutional violation, I would hold that, taking into

account the "specific context of th[is] case," the right was not clearly established at the time Officer Shields acted, and Shields is thus entitled to qualified immunity. *Id.* at 201. There is no way Shields could have anticipated that his fifteen minute delay in notifying Kennedy of his contact with Angela Burns or his assurance of additional police surveillance would operate to deprive her of her rights under the Due Process Clause of the Fourteenth Amendment. Even if he had read *Grubbs I* — but especially if he had read *Wallenstein* — Officer Shields could not have known that his conduct would violate clearly established constitutional rights. *See Meyers v. Redwood City*, 400 F.3d 765, 774 (9th Cir. 2005) ("Even with a copy of *Harris* in their back pockets, the officers could not have determined at what point in the middle of this messy repossession they deprived Meyers of her property without due process of law."). At the very least, after *Saucier*, the court should have declared a constitutional violation but granted qualified immunity in *this* case.

## III.   CONCLUSION

Given the tragic circumstances in which this case arises, the Court's instruction in *DeShaney* seems especially apt: "Judges and lawyers, like other humans, are moved by natural sympathy in a case like this" to find a way for Kennedy and her family "to receive adequate compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State," but by Michael Burns. 489 U.S. at 202-03. The people of Washington may prefer, and are free to adopt, a system of tort liability which would place upon the State and its officials the responsibility for situations such as the present one. "But they should not have it thrust upon them by this [c]ourt's expansion of the Due Process Clause of the Fourteenth Amendment." *Id.* at 203.

I respectfully dissent.